[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13775

_____

D.C. Docket No. 8:10-cv-02366-SDM-MAP


JOHNNY L. MARSHALL,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 12, 2016)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and RESTANI,[*] Judge.

TJOFLAT, Circuit Judge:

Johnny Marshall appeals the District Court's denial of his petition for a writ of habeas corpus seeking to vacate, pursuant to 28 U.S.C. § 2254, his Florida conviction and sentence for armed robbery with a firearm.  The issue before the District Court and now on appeal is whether the Florida courts unreasonably applied the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), in concluding that Marshall's attorney did not render ineffective assistance of counsel by failing to move the trial court to suppress an eye-witness identification on the ground that it was obtained in violation of the Fourth Amendment.[1]  The District Court concluded that the Florida courts' application of *Strickland* was not unreasonable.  We agree and accordingly affirm.

## I.

### A.

On June 15, 1998, a Pizza Hut take-out and delivery facility on Overlook Drive in Winter Haven, Florida was robbed.  Around 10:50 p.m., ten minutes

---

[*] Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

[1] The Fourth Amendment is applicable to the states by virtue of its incorporation through the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081 (1961).

2

before the Pizza Hut was set to close, a man walked inside, apparently to place an order for a large cheese pizza. Geraldine Jenkins, an employee of Pizza Hut, was the only person in the restaurant at the time and was occupied in the back of the building.[2] Jenkins eventually came out to greet the man and took his order. When Jenkins told the man the price for the pizza, he stared at her. Jenkins repeated the price, and in response, the man lifted up his shirt to display a gun placed inside the waistband of his pants. He asked her, "Do you know what this is?" Jenkins responded that she did. The man told Jenkins that he wanted money. Jenkins took money out of the cash register, counting it slowly so as to stall for time for the delivery driver to return from a delivery. The man told Jenkins that she did not need to count the money—that he would count it at home. Jenkins gave him the money, around $260, and he told her to turn around with her hands down and walk toward the back of the building as he exited. After he left, Jenkins pressed the alarm. She then tried to phone her manager with no luck. Reaching her assistant manager, she explained what had happened. She then called her husband, who called the police.

Deputy Thomas Van Sciver of the Polk County Sheriff's Office arrived soon thereafter and took a description of the perpetrator from Jenkins. Jenkins described the perpetrator as a black man, around the age of twenty-two, with a height of

---

[2] The following facts describing what occurred during the robbery derive primarily from Geraldine Jenkins's testimony at trial.

approximately 5'4", weighing approximately 115 pounds, dark-skinned, brown-eyed, with black hair and wearing a maroon shirt, black pants, and a white hat. Deputy Van Sciver issued a "Be on the Lookout" warning ("BOLO") with Jenkins's description of the man to the police officers in the area.

Around midnight, Deputy Darrell Horne, also of the Polk County Sheriff's Office, was dispatched to investigate a suspicious vehicle in an industrial park with closed warehouses and repair shops about a half of a mile from the Pizza Hut.[3] Deputy Horne drove his squad car to investigate and found Marshall and Benjamin Ivey in a truck in front of a closed auto-repair shop. The truck had no license plates, but instead had a piece of cardboard in the window.[4] Deputy Horne initiated a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[5] Marshall—a thirty-two-year-old light-skinned black man, 5'8" in height, and weighing around 180 pounds—emerged from the driver's side of the vehicle. He was shirtless, wearing black shorts, sweating profusely, and appeared nervous. Ivey, also a black man wearing black shorts, exited the vehicle. Deputy Horne asked the two men what they were doing, and they explained that they had

---

[3] The following facts derive primarily from Deputy Horne's testimony at trial.

[4] Deputy Horne testified that "[c]ommonly, people . . . put those cardboard plates in their window. Once they, like, lose a tag and they know their tag number, and they would write their tag number on that cardboard plate and display it. But it's not an actual plate."

[5] Under *Terry*, the Supreme "Court carved out an exception to the Fourth Amendment's default rule that all seizures must be supported by probable cause and held that officers could 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Valerio*, 718 F.3d 1321, 1324 (11th Cir. 2013) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570 (2000)).

been changing a flat tire. Deputy Horne patted down the two men and did a cursory search of the truck for officer safety. Deputy Horne did not find any weapons on the two men or in the truck, but did find a purple t-shirt. Deputy Horne called the on-scene supervisor, Lieutenant Mike Bass, who was at the Pizza Hut, to inform him of his findings and Bass instructed Horne to bring the two men to the Pizza Hut for a possible identification.

Deputy Horne handcuffed Marshall and Ivey and put them in the backseat of his squad car. He drove them to the Pizza Hut, where the officers informed Jenkins that she should not assume that either of the men was suspected of the crime but that if she saw the perpetrator, she should identify him. At this point, between an hour and an hour and a half had passed from the time of the robbery. The two men remained in the backseat of the squad car while Jenkins looked at them through a rear-door window, Marshall having donned the purple t-shirt.[6] Within two or three seconds, Jenkins identified Marshall as the perpetrator of the crime (the "Pizza Hut identification"), later stating that she had identified him by his eyes.[7] Fingerprints were found at the scene of the crime, but none usable for comparison purposes were Marshall's or Ivey's.

---

[6] There is some dispute about whether Marshall was directed to put on the t-shirt or whether he did so voluntarily.

[7] Jenkins stated that she had particularly noticed the perpetrator's eyes during the commission of the crime because they struck her as "very scary, very big." In her deposition, Jenkins said of Marshall's eyes: "I do know one thing, if I ever see his eyes and his face again I would remember." When asked, "What was it that made [her] think [that Marshall] was the

Five months later, on November 18, 1998, Jenkins was shown a photo array containing Marshall's photo, wearing the same purple t-shirt that he was wearing on the night of the robbery. There was one other man in the photo array wearing a purple article of clothing—a purple warm-up shirt. Jenkins again identified Marshall as the perpetrator of the crime.

B.

On August 25, 1998, an amended information was filed in the Circuit Court of Polk County, Florida, charging Marshall with armed robbery. After James Mel McKinley of the Public Defender's Office was appointed to represent him, Marshall pled not guilty and, from August 23–25, 1999, stood trial before a jury. Jenkins testified for the State and again identified Marshall as the perpetrator of the crime. He was convicted, and the court sentenced him to life imprisonment as a prison-release reoffender.[8] Marshall appealed his sentence to the Second District Court of Appeal of Florida ("DCA").[9] The court affirmed the conviction on September 15, 2000 as a summary disposition.[10]

---

same person [as the perpetrator]?" Jenkins responded, "Because of his eyes. . . . Just big brown eyes that—sort of like sunken in. . . . It was really spooky, spooky eyes." When discussing her future presence at trial, Jenkins, distressed, stated, "I see this man in my sleep so many times, his eyes, his face."

[8] *See* Fla. Stat. § 775.082(9)(a)(1)–(3).

[9] Jennifer Fogle of the Public Defender's Office represented Marshall on appeal to the DCA.

[10] Marshall did not seek review in the Supreme Court of Florida or the Supreme Court of the United States.

6

C.

On October 25, 2002, Marshall, proceeding pro se, moved the Circuit Court to vacate his conviction under Rule 3.850.[11] His motion presented five grounds for relief, including the one before us here—that his attorney rendered ineffective assistance of counsel under *Strickland* in failing to file a pretrial motion to suppress the Pizza Hut identification on the theory that it was obtained in violation of the Fourth Amendment, i.e., an illegal stop, arrest, and detention.

After the court, acting sua sponte, appointed Byron Hileman to represent Marshall, it held an evidentiary hearing on October 12, 2007. Three witnesses testified at the hearing: Marshall, McKinley, and Ronald Toward, an expert in the field of criminal defense.

McKinley, Marshall's trial attorney, testified that, at that time of Marshall's trial, he had twenty-seven years of experience as a lawyer, the last fourteen of which he served as an Assistant Public Defender. He stated that he had considered whether Deputy Horne's stop of Marshall and Ivey in the industrial park and his transportation of the two men to the Pizza Hut was illegal under the Fourth Amendment but concluded that it was not. Marshall testified that McKinley had

---

[11] Marshall filed the motion pro se, but received the assistance of court-appointed counsel to prosecute the motion.

7

told him that "there was nothing to suppress." Hileman, Marshall's collateral attorney, "candidly admitted . . . that . . . there were circumstances that 'probably justified' a *Terry* stop in this case, [and that he] would be focusing on whether [trial] counsel should have filed a motion to suppress based upon a claim that the Defendant's detention was illegally prolonged." Toward opined as an expert that he would have moved to suppress the Pizza Hut identification pretrial for the same reason.

The Circuit Court denied Marshall's Rule 3.850 motion on January 2, 2008. "After reviewing the depositions of Deputy Van Sciver, Deputy Horne, Lieutenant Bass, and Ms. Jenkins, . . . as well as the testimony and evidence adduced at the hearing regarding what defense trial counsel knew at the time," the court, applying *Strickland*, concluded that Marshall had not established that McKinley's failure to file a motion to suppress was deficient performance resulting in "an error 'so serious that he . . . was not functioning as the counsel guaranteed by the Sixth Amendment.'" The court observed that it was "undisputed that counsel consciously reviewed the [suppression] issue[] and then made the tactical and strategic decisions not to pursue . . . the motion to suppress. . . . '[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" Turning to *Strickland*'s required prejudice analysis,

8

the court held that Marshall's claim failed to prove that "even if counsel had filed [a] motion to suppress, such a motion had a reasonable probability of success."

Marshall appealed the Circuit Court's *Strickland* ruling to the DCA. Marshall argued that McKinley should have moved the court to suppress the Pizza Hut identification based solely on his half-hour detention following the *Terry* stop. The DCA affirmed the Circuit Court's ruling per curiam without a written opinion on September 18, 2009.

## D.

On October 18, 2010, Marshall filed his § 2254 petition in the United States District Court for the Middle District of Florida, presenting the same ineffective-assistance claim he had presented to the DCA. Specifically, Marshall argued that McKinley should have moved to suppress the Pizza Hut identification because the initial *Terry* stop was impermissibly extended so that it grew into a full-fledged illegal arrest without probable cause. Marshall argued that the failure to file the motion prejudiced his case, "because there was a reasonable probability that had this issue been litigated the outcome of [his] case would have been different due to the eyewitness identification testimony being the only link between the robbery

9

and [him]." The State, in response, contended that counsel's performance was not objectively unreasonable under *Strickland*.[12]

The District Court, applying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[13] specifically 28 U.S.C. § 2254(d), considered whether Marshall had shown that the DCA's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The court concluded that based on the record before the Polk County Circuit Court in the Rule 3.850 proceeding, and thus the DCA, Marshall had failed to make either showing and therefore denied the writ. We granted Marshall a certificate of appealability ("COA"), framing the issue as "[w]hether the state courts unreasonably applied *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), in concluding that Marshall's trial counsel did not provide constitutionally ineffective assistance by failing to move to suppress the evidence of the 'show-up' identification of Marshall."

---

[12] The State also argued that Marshall's petition was untimely under 28 U.S.C. § 2244(d). The District Court rejected the argument. The State abandoned the argument in briefing the instant appeal.

[13] *See* 28 U.S.C. § 2241 *et seq.*

10

## II.

In his opening brief on appeal, Marshall argues[14] that McKinley's performance was deficient under *Strickland* because he failed to move the Circuit Court pretrial to suppress the Pizza Hut identification on the ground that the identification was the fruit of a Fourth Amendment violation, i.e., Deputy Horne's illegal stop in the industrial park, his subsequent arrest without probable cause, and his transportation to the Pizza Hut. At the evidentiary hearing on his Rule 3.850 motion, Marshall conceded that the stop was permissible under *Terry*, and he did not question the validity of the stop in his appeal to the DCA. Marshall argued, instead, that his detention and transportation to the Pizza Hut fell beyond *Terry*'s reach. That is the argument the District Court entertained when it found that the DCA did not unreasonably apply *Strickland* and *Terry*.[15] And it is the argument we entertain here.

---

[14] Marshall's opening brief was filed pro se. After the State filed an answer brief, counsel was appointed for Marshall, and counsel filed another opening brief on behalf of Marshall. The State responded with another answer brief, and counsel filed a reply brief. Prior to oral argument, because Marshall's counseled brief did not contain an argument that McKinley's failure to raise the Fourth Amendment claim was ineffective but, instead focused on a claim Marshall had not presented to the DCA and raised in his § 2254 petition—that McKinley was ineffective for failing to move to suppress the Pizza Hut identification as impermissibly suggestive in violation of the due process clause of the Fourteenth Amendment—we ordered the parties either to adopt their original briefs (Marshall's pro se brief and the State's answer brief) or provide supplemental briefing on the Fourth Amendment issue stated in the COA. Marshall's attorney adopted Marshall's opening pro se brief, and the State filed an answer brief. Therefore, Marshall's pro se brief and the State's answer brief, both submitted in response to our order, are the operative briefs on appeal.

[15] Marshall also argues that his detention and transportation to the Pizza Hut was illegal under Florida's "Stop and Frisk Law," Fla. Stat. § 901.151, and that McKinley's failure to

We assess Marshall's argument in the same way the District Court did.[16]  As AEDPA instructs, we determine whether Marshall has demonstrated that the DCA's affirmance of the Circuit Court's denial of his *Strickland* claim

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Marshall does not contend that the DCA's decision was based on an unreasonable determination of the facts.  Rather, his argument is that the decision constituted an unreasonable application of clearly established Federal law, i.e., *Strickland*.

Under § 2254(d)(1), "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."

---

challenge the Pizza Hut identification on this ground constituted ineffective assistance.  Marshall did not cite this as a ground for Rule 3.850 relief; nor did he raise the point in his brief to the DCA.  The argument is unexhausted and procedurally defaulted.  *See Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) ("[I]n order to exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review.").

    [16]  The District Court reached its decision by looking over the DCA's shoulder, so to speak, to see whether the DCA's application of *Strickland* was unreasonable under 28 U.S.C. § 2254(d)(1).  Whether the DCA applied *Strickland* reasonably is a mixed question of law and fact, and we review the District Court's determination de novo.  *See Overstreet v. Warden*, 811 F.3d 1283, 1286 (11th Cir. 2016) (citing *Pardo v. Sec'y, Fla. Dep't of Corr.*, 587 F.3d 1093, 1098 (11th Cir. 2009)).

12

*Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000) (quoting 28 U.S.C. § 2254(d)(1)).  "'A state court decision involves an unreasonable application of [a] Supreme Court [holding] "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case."'" *Overstreet v. Warden*, 811 F.3d 1283, 1286 (11th Cir. 2016) (third alteration in original) (first quoting *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), and then quoting *Williams v. Taylor*, 529 U.S. 362, 407–08, 120 S. Ct. 1495, 1520, 146 L. Ed. 2d 389).  For "a state court's application of [Supreme Court] precedent" to be "'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520–21, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003) (citations omitted).  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been *squarely established* by [the Supreme] Court."  *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (first alteration in original) (emphasis added) (quotation marks omitted) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251 (2009)).  And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.* at 102, 131 S. Ct. at 786.

13

As these cases demonstrate, § 2254(d) "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) (citation omitted) (quoting *Richter*, 562 U.S. at 102, 131 S. Ct. at 786 and *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) (per curiam)).

When a petitioner makes an ineffective-assistance-of-counsel claim, the relevant Supreme Court law under 28 U.S.C. § 2254(d)(1) is *Strickland v. Washington*. To succeed on a *Strickland* claim, the petitioner has to show both that his counsel's performance was deficient and that that deficient performance was prejudicial—that is, that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068.

"There is a strong presumption that counsel's performance falls within the 'wide range of professional assistance'[;] the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 2586, 91 L. Ed. 2d 305 (1986) (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible

14

options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

Where, as here, the relevant allegation is that counsel "fail[ed] to litigate a Fourth Amendment claim competently . . . the defendant must also prove that his Fourth Amendment claim *is* meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Morrison*, 477 U.S. at 375, 106 S. Ct. at 2583 (emphasis added).

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Overstreet*, 811 F.3d at 1287 (quotation marks omitted) (quoting *Richter*, 562 U.S. at 105, 131 S. Ct. at 788). Under § 2254, we must evaluate the highest state-court decision that evaluated the claim "on the merits." 28 U.S.C. § 2254(d); *Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008). Here, that is the DCA's per curiam affirmance of the Rule 3.850 trial court's denial of the Rule 3.850 motion. *See Pinholster*, 563 U.S. at 187–88, 131 S. Ct. at 1402; *Richter*, 562 U.S. at 98, 131 S. Ct. at 784. Because the DCA did not give reasons for its summary affirmance, if there was any reasonable basis for the state court to deny relief, we are bound to affirm the denial of the petition. *Pinholster*, 563 U.S. at 187–88, 131 S. Ct. at 1402; *Richter*, 562 U.S. at 98, 131 S. Ct. at 784.

With the foregoing principles in hand, we proceed to evaluate Marshall's claim that McKinley was ineffective under *Strickland* in failing to seek the suppression of the Pizza Hut identification.

### III.

Marshall contends that the *Terry* stop evolved into a full-fledged arrest without probable cause; therefore, McKinley was constitutionally deficient in failing to move the trial court to suppress the Pizza Hut identification as fruit of an illegal arrest. The problem with Marshall's argument is that he cannot show that Supreme Court law at the time held that his seizure went beyond the scope of a *Terry* stop and into the realm of an illegal arrest. Absent such showing, he cannot establish that the DCA's rejection of his *Strickland* claim constituted "an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

At the time Marshall's conviction became final, the Supreme Court cases most closely on point were *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979), *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion), and *Hayes v. Florida*, 470 U.S. 811, 105 S. Ct. 1643, 84 L. Ed. 2d 705 (1985).[17] In *Dunaway*, the Supreme Court held that a

---

[17] In his pro se brief, Marshall also points us to *Kaupp v. Texas*, 538 U.S. 626, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003) (per curiam), and *United States v. Virden*, 488 F.3d 1317 (11th Cir. 2007). However, the law that we are to consider when evaluating the DCA's decision is

16

violation of the Fourth Amendment occurred when police seized the defendant

without probable cause and transported him to a police station for

interrogation.  442 U.S. at 216, 99 S. Ct. at 2258.   In finding there to be a Fourth

Amendment violation, the Supreme Court focused on the facts that the defendant

was "transported to a police station and placed in an interrogation room."  *Id.* at

212, 99 S. Ct. at 2256.  The Supreme Court later identified "[t]he pertinent facts

relied on by the Court in *Dunaway*" to be that: "(1) the defendant was taken from a

private dwelling; (2) he was transported unwillingly to the police station; and

---

Supreme Court holdings that existed at the time that the conviction became final.  28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 390, 120 S. Ct. at 1511.  Marshall's conviction became final in 2000, meaning that neither the trial court nor the DCA had these cases available to them when considering Marshall's *Strickland* claim.  And, Eleventh Circuit law, though useful in illuminating Supreme Court law at the time, is not decisive when evaluating the DCA's application of Supreme Court law.  In any event, *Kaupp* is distinguishable from the case at hand.  In *Kaupp*, a Fourth Amendment violation was found where police arrested the defendant in his home in the middle of the night without probable cause and, while transporting him to the police station for questioning, stopped briefly at a crime scene where a body had been recently found.  538 U.S. at 628–29, 123 S. Ct. at 1845.  The Supreme Court stated that "[s]uch involuntary transport to a *police station* for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.'"  *Id.* at 630, 123 S. Ct. at 1845 (emphasis added) (second alteration in original) (quoting *Hayes*, 470 U.S. at 816, 105 S. Ct. at 1647).  The instant case is distinguishable from *Kaupp* because here, Horne's primary goal was to transport Marshall and Ivey to the Pizza Hut for identification, rather than to a police station for questioning.

In *Virden*, the defendant's vehicle was seized without probable cause in violation of the Fourth Amendment when the police transported it and the defendant to another location to perform a canine sniff.  488 F.3d at 1320–22.  In *Virden*, admittedly, it appears that we have held that investigatory transportations transcend the allowable scope of a *Terry* stop.  488 F.3d at 1321.  Nonetheless, this does not show that the Supreme Court had foreclosed these transportations.  Under AEDPA, when "the precise contours of [a] right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *Woods v. Donald*, 575 U.S. __, __, 135 S. Ct. 1372, 1377, 191 L. Ed. 2d 464 (2015) (per curiam) (alteration in original) (quotation marks omitted) (quoting *White v. Woodall*, 572 U.S. __, __, 134 S. Ct. 1697, 1705, 188 L. Ed. 2d 698 (2014)).

17

(3) he there was subjected to custodial interrogation resulting in a confession." *United States v. Sharpe*, 470 U.S. 675, 684 n.4, 105 S. Ct. 1568, 1574 n.4, 84 L. Ed. 2d 605 (1985).  None of those facts is present here.

Similarly, in *Royer*, the Fourth Amendment was violated when, without probable cause, police transported the defendant to a police room in an airport and his searched his luggage.  460 U.S. at 494, 507, 103 S. Ct. at 1322, 1329.  Nonetheless, the Court stated that "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention."  *Id.* at 504, 103 S. Ct. at 1328.

In *Hayes*, a Fourth Amendment violation occurred when police transported the defendant to a police station without probable cause for fingerprinting.  470 U.S. at 814–15, 105 S. Ct. at 1646.  There the Court reiterated "that transportation to and investigative detention *at the station house* without probable cause or judicial authorization together violate the Fourth Amendment."  *Id.* at 815, 105 S. Ct. at 1646 (emphasis added).  The Court went on to state that its

> view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him *to the police station*, where he is detained, although briefly, for investigative purposes.

*Id.* at 816, 105 S. Ct. at 1647 (emphasis added).

18

*Dunaway*, *Royer*, and *Hayes* each involved the transportation of the defendant beyond the initial site of the stop without probable cause, as we assume happened here.  However, in stark contrast to the present case, in each of these cases the defendant was transported to a police station or official room for questioning or fingerprinting.  None of these cases involves a defendant being transported a short distance—less than a mile—to the scene of a crime for possible identification.

Further lending support to the proposition that Supreme Court law was, and still remains, murky as to whether the Fourth Amendment is violated when a defendant is transported to a crime scene for identification purposes as part of a *Terry* stop is a case from our sister circuit: *United States v. McCargo*, 464 F.3d 192 (2d Cir. 2006).  In *McCargo*, the Second Circuit found there to be no Fourth Amendment violation when police had planned to transport the defendant to the scene of an attempted burglary for identification purposes.[18]  464 F.3d at 195, 199.

---

[18]  Prior to transporting the defendant, the officers performed a pat-down for officer safety pursuant to the police department's policy requiring pat-downs before placing individuals in police vehicles.  *United States v. McCargo*, 464 F.3d 192, 196 (2d Cir. 2006).  The officers discovered a gun in the defendant's waistband, and the defendant was arrested and taken to police headquarters.  *Id.*  The defendant was therefore never taken to the site of the burglary.  He was indicted for possessing a firearm as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  *Id.*  The Second Circuit assumed that the officers did not have a reasonable suspicion that the defendant was armed but instead considered whether the pat-down could be justified solely on the departmental policy and the special interests at stake when transporting suspects.  *Id.* at 199.  Therefore, preliminary to the question of whether the pat-down was legal was the question of whether the planned transportation was legal.  *Id.*  The Second Circuit ultimately held that

19

First, the Second Circuit held that the officers had a reasonable, articulable suspicion to stop the defendant because they "spotted [the defendant] walking alone in a high-crime area where no other pedestrians were about." *Id.* at 197. It was just a few minutes after the burglary attempt and the defendant was only two hundred feet away from the crime scene. *Id.* With regard to the legality of the planned transportation for identification purposes, the Second Circuit held that "having good reason to think that [the suspect] might have something to do with the crime, we think it reasonable for the police to decide to extend the *Terry* stop briefly to transport [the defendant] to the crime scene to see whether he could be identified by the victim." *Id.* at 198. According to the Second Circuit, if "the police have a reasonable suspicion that a person was involved in a crime, they do not violate the Fourth Amendment rights of a suspect if they stop the suspect and transport him a short distance to the scene of the crime in furtherance of a legitimate law-enforcement purpose."[19] *Id.* at 199.

---

in cases where the police may lawfully transport a suspect to the scene of the crime in the rear of a police car, the police may carry out a departmental policy, imposed for reasons of officer safety, by patting down that person. Because the police have a legitimate law-enforcement reason to transport a suspect, we see little danger that policies such as these might be used as a pretext for a suspicionless frisk.

*Id.* at 202.

[19] The Second Circuit in *McCargo* cites two Supreme Court cases to support this statement: *United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983), and *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (per curiam). *Place* held that property may be temporarily seized without probable cause in accordance with

20

It makes good sense for transportations for identification to be allowable as part and parcel of *Terry* stops. The purpose of a *Terry* stop is to verify or dispel the officer's suspicion of wrongdoing as soon as possible so that the stopped person is quickly free to continue on his way. *See Royer*, 460 U.S. at 500, 103 S. Ct. at 1325–26. Minimally invasive transportations for identification like the ones in *McCargo* and here are completed quickly and with minor inconvenience to the defendant. If the defendant is not identified, he is free to continue on his way. If he is identified, the police may have apprehended the criminal quickly.

"Admittedly," there may be some "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest. Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe*, 470 U.S. at 685, 105 S. Ct. at 1575. But the Supreme Court has declined to apply a rigid rule when determining whether a seizure is appropriately analyzed as a *Terry* stop or an arrest. *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) ("[I]n distinguishing a true investigative stop from a *de facto* arrest, we must not adhere to 'rigid time limitations' or 'bright line rules.'" (quoting *Sharpe*, 470 U.S. at 685, 105 S. Ct. at 1575)). At the time

*Terry*. Though ultimately concluding that the limits of a *Terry* stop had been exceeded in that case, the Supreme Court briefly entertained the idea that a transportation in some circumstances need only be supported by a reasonable, articulable suspicion of wrongdoing: "[T]he police may confine their investigation to an on-the-spot inquiry[] . . . or transport the property to another location." *Place*, 462 U.S. at 705–06, 103 S. Ct. at 2643–44. In *Mimms,* a police officer ordered a driver out of a vehicle during a *Terry* stop. 434 U.S. at 109, 98 S. Ct. at 332.

Marshall's conviction became final, none of the Supreme Court cases discussing transportation of a defendant without probable cause confronted the situation here, where the defendant was transported to the scene of a crime for the purpose of identification.  Rather, all of the available cases discuss transportation, either directly or indirectly, to an official police room for questioning or fingerprinting. No Supreme Court law extant at the time Marshall's conviction became final declared that a *Terry* stop like the one here constituted a full-blown arrest. McKinley reviewed the issue and could have reasonably concluded that a motion to suppress the Pizza Hut identification would have failed.

Alternatively, McKinley's failure to file a motion to suppress on Fourth Amendment grounds did not render his performance deficient because Marshall could not show that the Fourth Amendment exclusionary rule would unquestionably have barred the Pizza Hut identification even if the detention and transportation violated the Fourth Amendment. The exclusionary rule precludes the introduction into evidence of the fruit of a search or seizure in violation of the Fourth Amendment.  *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S. Ct. 407, 415–16, 9 L. Ed. 2d. 441 (1963).  However, not

> all evidence is "fruit of the poisonous tree" simply because it would
> not have come to light but for the illegal actions of the police.  Rather,
> the more apt question in such a case is whether, granting
> establishment of the primary illegality, the evidence to which instant
> objection is made has been come at by exploitation of that illegality or

22

instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* at 487–88, 83 S. Ct. at 417 (quotation marks omitted).

The Supreme Court cases at the time that come closest to showing that an identification made after the defendant has been illegally detained would have been suppressed are *Johnson v. Louisiana*, 406 U.S. 356, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972), and *United States v. Crews*, 445 U.S. 463, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980). In *Johnson*, the Supreme Court held that a line-up identification obtained following an illegal arrest need not have been excluded because the identification had not been obtained by exploiting the illegal arrest; instead, it had been obtained under circumstances that purged the primary taint of the illegal arrest. 406 U.S. at 365, 92 S. Ct. at 1626. Those circumstances were the defendant's representation by counsel and presentation before a magistrate judge to advise him of his rights and to set bail. *Id.* In *Crews*, the Supreme Court held that an in-court identification of a defendant by a victim did not need be suppressed as fruit of an illegal arrest, because the victim's identification did not stem from the police's illegal conduct. 445 U.S. at 470–73, 100 S. Ct. at 1249–51.

Additionally, a case from the former Fifth Circuit[20] illuminates Supreme Court law at the relevant time: *Passman v. Blackburn*, 652 F.2d 559 (5th Cir. Unit A Aug. 1981).  In *Passman*, two men, later identified as Walter Burnette and Glenn Passman, gained entry to a home, committing robbery and sexual assault. *Id.* at 563–64.  The two men fled the home, and a description of them was radioed to police in the area.  *Id.* at 564.  That night, Passman was arrested in his home and taken to the police station, where he was identified by a member of the family as one of the perpetrators of the crimes.  *Id.* at 564–65.  The former Fifth Circuit held that even though probable cause to arrest Passman was lacking, evidence that a family member identified him following his arrest on the night of the crime was not fruit of an illegal arrest that had to be excluded because the identification stemmed from the family member's personal identification of the defendant, not from the illegal arrest.[21]  *Id.* at 565.

---

[20]  Cases of the former Fifth Circuit handed down before October 1, 1981 have been adopted as binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[21]  The *Passman* Court stated that the identification "ha[d] a source independent of the illegal seizure," that is, the family member's "face to face contact with" Passman. *Passman*, 652 F.2d at 565.  Her

> identification testimony was not derived in fact from the illegal police action.  Nor [wa]s this a situation where an illegal search is conducted to discover the witness.  The Supreme Court has "declined to adopt a 'per se' or 'but for' rule that would make inadmissible any evidence, whether tangible or live witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest."  The basis of [her] testimony [wa]s her personal observation, the testimony d[id] not derive from the illegal arrest.

*Id.* (citations omitted) (quoting *United States v. Ceccolini*, 435 U.S. 268, 276, 92 S. Ct. 1054, 1060, 55 L. Ed. 2d 268 (1978)).

Here, McKinley, a lawyer with twenty-seven years of experience and fourteen years of experience at the Public Defender's office, could have reasonably believed that the Pizza Hut identification were not fruit of an illegal seizure because, as in *Passman*, an independent source for the identification existed: namely, Jenkins's observation of Marshall. [22]  *Cf. Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc) ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.").  The identification of Marshall arguably did not derive from the seizure and transportation, rather, it plausibly derived from Jenkins's close-up[23] "personal observation" of Marshall and her very specific memory of his eyes.  *See id.*

Overall, Marshall had a plausible Fourth Amendment claim, but even "a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ."  *Morrison*, 477 U.S. at 382, 106 S. Ct. at 2586–87; *see also Richter*, 562 U.S. at 102, 131 S. Ct. at 786 ("It bears repeating that even a strong case for relief

---

[22] Jenkins's observation of Marshall, as described in the BOLO, admittedly raises concerns over the reliability of her observation.  But, McKinley did question Jenkins about her inaccurate description during cross-examination.

[23] Jenkins was across the two-foot counter from the perpetrator during the encounter and testified during the trial that she was about as far from the perpetrator as she was from the court reporter.

25

does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be." (citation omitted)). Assuming that Marshall has shown that his seizure without probable cause was in violation of the Fourth Amendment, he has not established that the Pizza Hut identification would have been suppressed as fruit of the illegal seizure. *See Woods v. Donald*, 575 U.S. __, __, 135 S. Ct. 1372, 1377, 191 L. Ed. 2d 464 (2015) (per curiam) ("[W]here the precise contours of [a] right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." (second alteration in original) (quotation marks omitted) (quoting *White v. Woodall*, 572 U.S. __, __, 134 S. Ct. 1697, 1705, 188 L. Ed. 2d 698 (2014))); *cf. id.* (noting that because no Supreme Court "cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from [the Supreme Court.]" (quoting *Lopez v. Smith*, 574 U.S. __, __, 135 S. Ct. 1, 4, 190 L. Ed. 2d 1 (2014) (per curiam))). Therefore, the DCA could have reasonably determined that McKinley was not ineffective in failing to pursue a motion to suppress the Pizza Hut identification. *Cf. Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). The DCA's decision that McKinley was not ineffective for failing to pursue a motion to suppress the Pizza Hut identification based on a violation of the Fourth

26

Amendment was not an unreasonable application of Supreme Court law. Because Marshall has not shown that McKinley rendered deficient performance, we need not reach the issue of prejudice.

IV.

For the foregoing reasons, the District Court's denial of Marshall's petition is AFFIRMED.

AFFIRMED.

ROSENBAUM, Circuit Judge, concurring:

Johnny Marshall has already spent seventeen years in jail for a $261 robbery that he very well may not have committed. And after our decision today, he may spend the rest of his life there. But Marshall's attorney almost certainly could have prevented Marshall's conviction, had he done what any other competent attorney would have on this record: pursued a motion to suppress the illegally obtained sole eye-witness's identification of Marshall, an identification that the same witness's earlier description of Marshall squarely contradicted.

I write separately because I believe that Marshall was denied effective assistance of counsel, in violation of the Sixth Amendment. Nevertheless, despite the weak evidence underlying Marshall's conviction and the substantial error his trial counsel made, I agree with the Majority's ultimate conclusion that 28 U.S.C. § 2254 offers Marshall no relief. Whether because of § 2254's strict statutory exhaustion requirements or its highly deferential standard of review of state-court decisions, we have no choice but to deny Marshall's claim. At this point, any potential relief Marshall might obtain must come from the state, such as an act of clemency by the state's executive branch.

**I.**

Thin. That's a generous way to describe the evidence against Marshall. The

28

only evidence tying Marshall to the robbery consists of Geraldine Jenkins's identification of him.  But Jenkins—the Pizza Hut employee who was present during the robbery—identified Marshall within about an hour of providing a description of the robber that bore about as much resemblance to Marshall's actual appearance as broccoli does to carrots.  Both are in the same general category— men and vegetables, respectively—but that's where the similarities end.

Jenkins said the robber was roughly 5'4" and weighed about 115 pounds, but Marshall is 5'8" and weighed no less than 178 pounds at the time of the robbery. Even setting aside the difference in height, Jenkins described a man who, by objective standards, would have been underweight, but Marshall was, in fact, overweight by objective standards when the robbery occurred.[1]

The discrepancies between Jenkins's description of the robber and Marshall's actual appearance did not end there.  Jenkins characterized the robber as a dark-complexioned black man, but Marshall has a light complexion; Jenkins

---

[1] According to the United States Department of Health and Human Services National Institutes of Health's ("NIH") body mass index ("BMI") calculator, *see* http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited July 1, 2016), a 5'4" person weighing 115 pounds has a BMI of 17.9, while a 5'8" person weighing 178 pounds has a BMI of 27.1.  NIH's website describes those with BMI scores "[b]elow 18.5" as "[u]nderweight" and those with BMI scores between 25.0 and 29.9 as "[o]verweight" (those with scores between 18.5 and 24.9 are characterized as "[n]ormal"). http://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm (last visited July 1, 2016).  Though Jenkins stated that the robber had a "medium" build—a subjective description—her objective description described an underweight man.  And, in any case, Jenkins did not describe an overweight man, like Marshall was.

29

estimated that the robber was about 22 years old, but Marshall was 31 at the time; Jenkins characterized the robber's teeth as "normal," but Marshall has an overbite and "very crooked teeth that are immediately obvious as soon as you look at his teeth when he opens his mouth." Jenkins reported that the robber wore a white painter's cap, but Marshall neither wore nor was found with a white hat of any type or a painter's cap of any color.

During her testimony, Jenkins insisted that the robber's shirt had a word written in white letters on the left shoulder, but Marshall was shirtless when he was found, and neither of the two shirts discovered with him had writing on the shoulder. In fact, Jenkins expressly denied that the robber wore either of the shirts recovered with Marshall.

Jenkins said the robber showed her a gun with a black handle and a "brown trim plate," but Marshall had no gun with him when he was found; Jenkins stated that she gave the robber about $260, but Marshall did not have the stolen money when he was found; and Jenkins recalled that no vehicle was waiting for the robber outside the store, but Marshall was in his truck when law enforcement encountered him.

Not only did officers fail to find the hat, shirt, gun, and money with Marshall, but hours of scouring the entire area within a one-block perimeter of where Marshall was found—including with the aid of a police K-9 unit—did not

30

turn up any of these items or any other evidence linking Marshall to the robbery in any way. So the facts about Marshall and what was found—or more accurately, not found—in his possession paint a stark contrast from Jenkins's detailed description of the robber. And they do so even though Jenkins had learned before the robbery to take notice of "all the details" about any robber's appearance that she could, such as the height, weight, and distinguishing features; the store was brightly lit when the robbery occurred; and only roughly a two-foot counter separated Jenkins from the robber. Significantly, Jenkins's problematic identification of Marshall was the only direct evidence entered against him at trial.[2]

## II.

Jenkins identified Marshall three times: (1) on the night of the robbery, after the officer drove Marshall from where his truck was found to the Pizza Hut; (2)

_____

[2] The only circumstantial evidence consisted of Marshall's presence about a mile away from the Pizza Hut, roughly an hour after the robbery. But the scene where law enforcement found Marshall corroborated Marshall's explanation for what he was doing there. Marshall told the officer who stopped him that he had pulled into the lot to fix a flat tire. Consistent with Marshall's statement, Marshall's truck contained a damaged tire, and Marshall was sweating profusely—even through the top of his shorts—as if he had just changed a truck tire on a hot June night in Florida, which, of course, it was. If Marshall was changing the tire before law enforcement arrived, it is difficult to conceive of when he would have had time to hide the money, the gun, the shirt, and the hat from the robbery—particularly since he likely would have had to have hidden them more than a block away from his truck, since even a K-9 unit never found any of these items in law enforcement's thorough search of the one-block perimeter. In addition to lacking the time to successfully hide these items, had Marshall been the robber, it seems highly unlikely that he would have had the foresight to conceal them, considering that the robber did not even take the most minimal precaution of trying to disguise his appearance during the robbery. And if Marshall was not changing the tire, it is hard to imagine why Marshall would have been where he was found had he committed the robbery, since he could have driven 30 miles away by that time, since the truck was apparently otherwise operational.

31

about five months after the robbery, from a photographic lineup containing a picture of Marshall wearing exactly the same thing he wore when Jenkins identified him on the night of the robbery; and (3) in court during the trial, when Marshall was the only one other than counsel sitting at the defendant's table.

With respect to the first identification, upon learning that he was to be transported to the Pizza Hut, Marshall put on a purple t-shirt that was found in his truck.  Then law enforcement handcuffed Marshall and his colleague, Ben Ivey, behind their backs, while they were at the location where Marshall's truck was found, and an officer put the two men into his car.  The officer drove Marshall and Ivey to the robbed Pizza Hut.  Once they arrived, the officer brought Jenkins to the back door of his car, where Marshall and Ivey were handcuffed inside, sitting behind a partition separating the rear seat from the front seat.  Since, by this point, it was around midnight and dark, the officer shined his flashlight through the car window and on the men.  By flashlight light and through a window, Jenkins identified Marshall, who was sitting next to the door where Jenkins was standing.  As a result of Jenkins's identification, law enforcement arrested Marshall for the robbery.

Five months after the robbery, on November 18, 1998, Jenkins went to the State Attorney's Office and reviewed a color photo lineup of twelve men.  Included in the lineup was a picture of Marshall in his purple t-shirt, taken on the

32

night of the robbery. Even setting aside the obvious taint that likely came from the fact that Jenkins had seen Marshall's face in the back of the police car on the night of the robbery, only one other man in the lineup wore a purple shirt, but his shirt was a turtleneck—a piece of clothing that would never be worn outside in Florida in the middle of June, when the robbery occurred. Not surprisingly, Jenkins identified Marshall.

Finally, the last identification occurred in court during Marshall's testimony. Of course, during trial, Marshall—the sole defendant—sat at the defense table with only his lawyer during the trial. When asked to identify the robber, Jenkins pointed to Marshall and said, "That man right there beside [his lawyer]." Between Marshall's status as the only other person at the defense table and the fact that, by this time, Jenkins had twice previously been shown Marshall's face, Jenkins's in-court identification of Marshall was about as unexpected as the mention of Voldemort in a *Harry Potter* novel.

These contradicted identifications are the sole evidence tying Marshall to the robbery.

## III.

And they could have been suppressed under Florida law. Section 901.151, Fla. Stat.[3]—a law that has been on Florida's books since 1969—prohibits a *Terry* stop[4] from extending "beyond the place where it was first effected or the immediate vicinity thereof," upon penalty of exclusion of any evidence resulting from a violation.[5] Under the plain language of this statute, "an investigatory stop

---

[3] The Majority considers only Marshall's argument that his *Terry*-stop detention violated federal law, not that it violated state law. In the Majority's view, Marshall never raised the state-law argument prior to filing his brief before us, so he procedurally defaulted the issue. I respectfully disagree. During the evidentiary hearing on Marshall's Rule 3.850 motion in the state circuit court, Marshall asked his trial counsel, "Did you consider that at the time that the officer had completed his search and identification procedure that his **continued detention** of Mr. Marshall was illegal? *That continued detention being putting him in handcuffs in the car, and taking him two miles to another site*." (emphasis added). Then Marshall asked his trial counsel about the applicability of Fla. Stat. § 901.151(3), inquiring specifically by statutory number about his counsel's knowledge of that provision. Even the judge became involved in the discussion, and his comments indicate that he was reviewing the two-sentence statute during the questioning. Indeed, the judge stated he "want[ed] to take a look" at the statute. He then later described § 901.151(3) as "deal[ing] with the stop and frisk law" and noted that the provision had last been amended in 1997. If, in fact, Marshall had procedurally defaulted this meritorious issue, his collateral counsel would have also been ineffective. But that would not have been actionable under § 2254 since Florida allows on direct appeal ineffective-assistance claims like this one that may be established from the face of the trial record. *See Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012).

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

[5] Section 901.151 provides,

> (2) Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, the officer may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person's presence abroad which led the officer to believe that the person had committed, was committing, or was about to commit a criminal offense.

may not extend beyond the place of the initial encounter." *Kollmer v. State*, 977 So. 2d 712, 715 (Fla. Dist. Ct. App. 2008) (citing *Saturnino-Boudet v. State*, 682 So. 2d 188, 193 (Fla. Dist. Ct. App. 1996); *Hayes v. Florida*, 470 U.S. 811, 105 S. Ct. 1643 (1985); *Dunaway v. New York*, 442 U.S. 200, 216, 99 S. Ct. 2248 (1979)). Though *Kollmer* referred in 2008 to this interpretation as "well settled," it relied on a 1996 Florida District Court of Appeal case for that proposition. *See id.* 1996, of course, predates the robbery that occurred in Marshall's case.

In *Kollmer*, the defendant was found in a yard, after having run through some woods in escaping from the crime scene. 977 So. 2d at 713-14. An officer transported the defendant back to the crime scene for identification by the victim. *Id.* at 714. Though the Florida appellate court found the initial stop to be lawful, it

---

(3)  No person shall be temporarily detained under the provisions of subsection (2) longer than is reasonably necessary to effect the purposes of that subsection. ***Such temporary detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof***.

. . .

(6)  ***No evidence seized by a law enforcement officer in any search under this section shall be admissible against any person in any court of this state or political subdivision thereof unless the search which disclosed its existence was authorized by and conducted in compliance with the provisions of subsections (2)-(5)***.

(emphasis added).

35

concluded that the transportation of the defendant violated Fla. Stat. § 901.151(3). *Id.* at 715.  So the court suppressed the resulting identification. *Id.*  Indeed, Florida courts have interpreted § 910.151(3) as prohibiting the transportation of a defendant without probable cause, beyond a short distance that would be reasonably walkable.[6]  *See, e.g., Griggs v. State*, 994 So. 2d 1198, 1201 (Fla. Dist. Ct. App. 2008) (transportation of defendant from the crime scene to the police station was outside the "immediate vicinity" and violated § 901.151(3)); *United States v. Hannah*, 98 So. 3d 226, 228 (Fla. Dist. Ct. App. 2012) (transportation of defendant "two houses down to the crime scene" fell within the "immediate vicinity").

For these reasons, Section 901.151(3) prohibits the type of transportation that occurred in Marshall's case.  Just like in Kollmer's case, in the absence of probable cause, law enforcement transported Marshall by police car about a mile away, to the scene of the crime—well beyond the "place of the initial encounter." *Kollmer*, 977 So. 2d at 193.  As a result, also as in Kollmer's case, the

---

[6] As the panel notes, we have similarly observed that the transportation of a defendant without probable cause exceeds the parameters of a lawful *Terry* stop: "We have frowned upon the movement of individuals for [purposes of investigation]." *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007) (citing *United States v. Hardy*, 855 F.2d 753, 760-61 (11th Cir. 1988); *Hayes*, 470 U.S. at 816, 105 S. Ct. at 1647).

36

identification of Marshall following his illegal transportation to the scene of the crime was inadmissible under § 901.151(6).[7]

## IV.

By failing to seek to suppress Jenkins's identification of Marshall, trial counsel rendered ineffective assistance in violation of the Sixth Amendment. The Supreme Court established the standard for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under that case, a petitioner must establish both deficient performance and resulting prejudice in order to set forth a successful claim. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003). Trial counsel's failure to file a suppression motion under the circumstances in Marshall's case easily satisfies both.

To show deficient performance, a petitioner must establish that his counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88, 104 S. Ct. at 2064. We evaluate counsel's performance by considering whether it was reasonable "under prevailing professional norms." *Hinton v. Alabama*, ___ U.S. ___, 134 S. Ct. 1081, 1088 (2014) (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2052) (internal quotation marks omitted). While "strategic choices made after thorough investigation of law and facts

---

[7] *Passman v. Blackburn*, 652 F.2d 559 (5th Cir. Aug. 6, 1981), on which the Majority relies, bears not at all on the application of Fla. Stat. § 901.151. The defendant in *Passman* was arrested under Louisiana law, not Florida law, so our predecessor court did not consider the prohibitions of Fla. Stat. § 901.151.

relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2052, decisions made based on a lawyer's unreasonable mistake of law constitute deficient performance. *Kimmelman v. Morrison*, 477 U.S. 365, 385, 106 S. Ct. 2574, 2588 (1986). As the Supreme Court has explained, "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton*, 134 S. Ct. at 1089 (citing *Williams v. Taylor*, 529 U.S. 362, 395, 120 S. Ct. 1495 (2000); *Kimmelman*, 477 U.S. at 385, 106 S. Ct. at 2588).

Here, counsel's failure to file a suppression motion occurred not as a matter of strategy, but rather, as a matter of ignorance. Had counsel performed basic research, he would have known that Florida law supported suppression under the facts of Marshall's case. True, counsel attempted to couch his failure to pursue a pretrial suppression motion as a matter of strategy. Specifically, counsel testified during the evidentiary hearing on Marshall's Rule 3.850, Fla. R. Crim. P., motion that he chose not to pursue a written pretrial suppression motion "because it was a waste of time, and [he] could do it just as effectively at trial."

But counsel never objected at trial to the admissibility of Jenkins's robbery-night identification of Marshall. So even assuming, *arguendo*, that foregoing a pretrial suppression motion for the convenience of an in-trial objection constituted

38

a reasonable strategy, counsel did not employ it in Marshall's case. And counsel repeatedly insisted (incorrectly) at the Rule 3.850 hearing that Florida law foreclosed the possibility of a successful suppression motion in Marshall's case. Counsel even effectively admitted that he was not familiar with the contents of Fla. Stat. § 901.151(3). Considering that the law had been in effect since 1969 and was last amended more than a year before Marshall's trial, basic research would have revealed the law's existence, and by objective standards, any reasonably competent attorney would have sought exclusion of the identification as the fruit of a violation of § 901.151(3). Marshall's trial counsel's failure to do so was necessarily deficient performance under *Strickland*.

Counsel's error was also highly prejudicial. *Strickland* prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. A "reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome." *Id.*

The error in this case epitomizes prejudice. Florida courts' interpretation of Fla. Stat. § 901.151(3) shows that had counsel filed a suppression motion based on the violation of that provision, the motion would have stood a good chance of succeeding. If it had, under § 901.151(6), Jenkins's robbery-night identification of Marshall would have been suppressed as a fruit of the violation of § 901.151(3).

39

And Jenkins's photospread identification likely would have been suppressed as well, considering the taint arising from the improper robbery-night show-up identification, the fact that Marshall was wearing the same thing in the photo that he wore when Jenkins originally identified him, and the fact that he was the only one wearing a purple t-shirt in the 12-person photospread.

If these items were suppressed, that would have left only Jenkins's in-court identification of Marshall. But even if the photospread identification were not suppressed, at best, the sole evidence tying Marshall to the crime would have been Jenkins's photo identification five months after the robbery and her in-court identification of Marshall more than a year after the crime—both of which were squarely contradicted by Jenkins's robbery-night description of the robber. Particularly in light of the evidence suggesting that Marshall was not the perpetrator—the fact that no gun, money, cap, or shirt with writing on the left shoulder were found at or within a one-block perimeter of Marshall, despite the use of a police K-9 and a multi-hour search—there is certainly a "reasonable probability that but for counsel's [failure to file a suppression motion], the result of [Marshall's trial] would have been different." *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

40

Put simply, under *Strickland* and its progeny, counsel's failure to file a suppression motion amounted to ineffective assistance of counsel, in violation of Marshall's Sixth Amendment right to effective counsel.

## V.

But, as a federal appellate court, we do not decide the merits of Marshall's *Strickland* claim in the first instance. Instead, that is up to the Florida courts.

Title 18, United States Code, Section 2254 severely circumscribes our review of the Florida courts' resolution of the claims of ineffective assistance brought before them. As relevant here, § 2254(b) statutorily demands the state-court exhaustion of any claim a petitioner may have before a federal court may grant relief on that same claim. Under § 2254(b)'s exhaustion provisions, when a petitioner identifies an issue in his § 2254 motion that he did not raise or pursue in state court, we lack the discretion to grant relief on that claim.

And if a petitioner overcomes the exhaustion hurdle, under 18 U.S.C. § 2254(d), we must defer to the state court's resolution of the prisoner's habeas claims unless the state court's decision "'was contrary to' federal law then clearly established in the holdings of [the Supreme Court] . . . ; or . . . it 'involved an unreasonable application of' such law . . . ; or . . . it 'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100, 131 S. Ct. 770, 785 (2011) (citations

41

omitted).  When claims based on *Strickland* are at issue, such as in Marshall's case, our review of the state court's decision is "doubly deferential."  *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 13 (2013).  That is so because "[j]udicial scrutiny of counsel's performance must be highly deferential" under *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, and §2254(d), by its terms, independently requires us to review state-court decisions deferentially.  *See Cullen v. Pinholster*, 563 U.S. 170, 190, 131 S. Ct. 1388, 1403 (2011).

The Majority believes that Marshall failed to exhaust his state remedies with respect to his claim that counsel was ineffective in violation of *Strickland* when he failed to file a motion to suppress premised on § 901.151(3) and (6).  Though I respectfully disagree, it makes no difference to the outcome of Marshall's case. Even if Marshall sufficiently exhausted his state-court remedies on the § 901.151 issue, he cannot show that the state court's application of *Strickland*'s prejudice prong[8] was contrary to or involved an unreasonable application of federal law.

---

[8] The state court's application of *Strickland*'s performance prong, however, was contrary to federal law and did involve an unreasonable application of *Strickland*.  It also was based on an unreasonable determination of the facts in light of the record before the state court.  Specifically, the state court concluded that trial counsel had "consciously reviewed the issues and then made the tactical and strategic decisions not to pursue either the motion to suppress or the motion to exclude."  But during his testimony at the Rule 3.850 hearing, trial counsel offered only two reasons for not seeking suppression that could even arguably be deemed strategic:  (1) he asserted that filing a written suppression motion "was a waste of time, and [he] could do it just as effectively at trial," and (2) he thought no "judge in the state of Florida" would have granted the motion.  Even assuming that objecting at trial in lieu of filing a written motion to avoid inconvenience qualifies as "strategy," trial counsel did not, in fact, object at trial to admission of the fruits of the violation of Florida law.  So it was plainly unreasonable for the state court to

42

The state court found no prejudice because it concluded that even had a suppression motion been filed, it would have lacked a reasonable probability of success. I respectfully disagree with that conclusion, based on the plain language of § 901.151(3) and (6) and the Florida caselaw construing it. But it really does not matter what I think because Florida courts are the arbiters of Florida law. And a Florida appellate court affirmed the state circuit court's order. In any event, even if the Florida courts were mistaken, an unreasonable application of Florida law is not an unreasonable application of federal law. So it provides no basis for relief under § 2254(d).

## VI.

This case raises serious and troubling issues. Under the narrow scope of review that § 2254 imposes on federal courts, however, we are constrained to affirm the district court's denial of relief. Marshall's potential relief, if any, appears to lie in the hands of the state.

---

base its finding of strategy even in part on this explanation. In addition, the record betrays trial counsel's ignorance of § 901.151(3) and 6. Long before the Florida court heard Marshall's Rule 3.850 motion, the Supreme Court established that a lawyer's decisions based on an unreasonable mistake of law violate *Strickland*'s performance prong. *See Kimmelman*, 477 U.S. at 385, 106 S. Ct. at 2588. Here, counsel failed to seek suppression because of his unreasonable mistake of law that Florida law did not provide a basis for a suppression motion in the circumstances of Marshall's case. In fact, however, § 901.151(3) did; it provided a very solid basis for a suppression motion. Because the Florida court incorrectly characterized counsel's failure to file a suppression motion as a matter of strategy instead of as an unreasonable mistake of law, it incorrectly and unreasonably applied *Strickland*'s performance prong.

43