**UNITED STATES of America, Appellant–Cross–Appellee,**

v.

**Dustin L. McCARGO, Defendant–Appellee–Cross–Appellant.**

**Docket Nos. 05–4026–cr(L), 05–4238–cr(XAP).**

United States Court of Appeals, Second Circuit.

Argued: April 20, 2006.

Decided: Sept. 13, 2006.

---

James P. Kennedy, Jr., Assistant United States Attorney (Kathleen M. Mehltretter, Acting United States Attorney for the Western District of New York, on the brief), Buffalo, NY, for Appellant–Cross–Appellee.

Marianne Mariano, Assistant Public Defender, Federal Public Defender's Office, Western District of New York, Buffalo, NY, for Defendant–Appellee–Cross–Appellant.

Celeste L. Koeleveld, Assistant United States Attorney (Michael J. Garcia, United States Attorney for the Southern District of New York, Harry Sandick, Assistant United States Attorney; Kevin J. O'Connor, United States Attorney for the District of Connecticut, William J. Nardini and Robert M. Spector, Assistant United States Attorneys; Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney; Glenn T. Suddaby, United States Attorney for the Northern District of New York, Brenda K. Sannes, Assistant United States At-

torney; David V. Kirby, United States Attorney for the District of Vermont, of counsel) for the United States Attorneys' Offices of the Southern, Eastern, and Northern Districts of New York, the District of Connecticut, and the District of Vermont as amici curiae in support of Appellant–Cross–Appellee.

Darrell B. Fields, Federal Defenders of New York, Inc. Appeals Bureau (Alexander Bunin, Federal Public Defender for the Northern District of New York; Thomas Dennis, Federal Public Defender for the District of Connecticut; and Michael DeSaultels, Federal Public Defender for the District of Vermont, of counsel) for the Federal Public Defenders Offices of the Second Circuit as amici curiae in support of Defendant–Appellee–Cross–Appellant.

Before WALKER, Chief Judge,
JACOBS and WALLACE,* Circuit
Judges.

JOHN M. WALKER, JR., Chief Judge.

Defendant-appellee-cross-appellant Dustin L. McCargo ("defendant" or "McCargo") was stopped by the Buffalo Police on July 28, 2003, blocks from a reported attempted burglary. The officers decided to take McCargo back to the scene of the alleged crime to see if the victim could identify him. Because the officers planned to transport him in the back of their patrol car, they frisked him for weapons in accordance with a departmental policy. During the frisk, the officers discovered a handgun. McCargo was arrested and later charged in federal court with possession of a firearm by a convicted felon. See 18 U.S.C. §§ 922(g)(1), 924(a)(2).

McCargo moved to suppress the gun. He argued that the frisk of his person, without a reasonable suspicion that he was armed, violated his Fourth Amendment rights. The district court agreed and suppressed the gun. It held that the initial stop and detention of McCargo was constitutional but that the officers were not permitted to frisk him unless they had a reasonable suspicion that he was armed. The government appealed, and McCargo, claiming error in the district court's holding that the initial stop was constitutional, cross-appealed.

## BACKGROUND

At 12:53 a.m. on July 28, 2003, the 911 operator for the Buffalo Police Department was told by a caller from 501 Berkshire Avenue that someone was attempting to break into his residence. The only additional details the caller provided were that more than one person was trying to enter the house and that some of the perpetrators had gone around to the back of the house. Based on this 911 call, a Buffalo Police dispatcher transmitted a radio message to patrol cars in the area of 501 Berkshire Avenue.

Buffalo Police officers Sterlace and White were in a patrol car less than two blocks from 501 Berkshire when they received the radio transmission. They then proceeded eastbound on Berkshire. As they came to the intersection of Berkshire and Suffolk Street, the officers saw McCargo crossing Berkshire and continuing to walk north on the east side of Suffolk. The residence at 501 Berkshire is located on the south side of Berkshire, approximately 200 feet to the east of the intersection. The officers testified that as McCargo was walking north he was star-

---

* The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

ing intently to his right at another patrol car that had already arrived at 501 Berkshire, so intently in fact that he did not notice Sterlace and White's car as the officers approached him.

The officers turned left onto Suffolk, drew along side the defendant, and told him to stop and approach the car. Sterlace testified that he wanted to detain McCargo to take him back to 501 Berkshire for possible identification by the victim. Both officers then left their car, and Sterlace patted down the defendant. White testified that it was departmental policy to pat down all persons before placing them in the back of a police car to protect the officers' safety.

While patting down McCargo, Sterlace felt a gun in McCargo's waistband. McCargo jumped away from Sterlace, and the gun became lodged in McCargo's sweatshirt and eventually fell to the ground. McCargo was placed under arrest and taken to police headquarters. A total of two minutes and thirty-eight seconds elapsed between the time the officers advised dispatch that they were proceeding to the scene and the time of the arrest. Because the officers responded to the dispatch call at most three minutes after the initial 911 call, less than six minutes elapsed between the time the 911 call was placed and the time of McCargo's arrest.

A federal grand jury indicted McCargo for the possession of a firearm by a convicted felon. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). After McCargo moved to suppress the gun as the product of an unconstitutional search, the motion was referred to a magistrate judge (H. Kenneth Schroeder, Jr., *Magistrate Judge)*, who found that the police had reasonable suspicion to stop McCargo, based on his location near the scene of the crime in a high-crime area very soon after the 911 call. The magistrate judge determined, however, that the pat-down was unconstitutional because the officers had no suspicion that McCargo was armed and recommended that the gun be suppressed. The district court (John T. Elfvin, *Judge)* adopted the magistrate judge's recommendations. The government appealed pursuant to 18 U.S.C. § 3731, and McCargo filed a cross-appeal.

## DISCUSSION

### I. The Fourth Amendment Generally and Appellate Review

█ The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV. Evidence seized pursuant to an unreasonable search or seizure or evidence that is the "fruit" of an unreasonable search or seizure must be suppressed and cannot be used in the prosecution's case in chief. *James v. Illinois,* 493 U.S. 307, 312, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990); *Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). While searches and seizures conducted without a warrant are presumptively unreasonable, *see Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), several exceptions to the warrant requirement have been fashioned when circumstances demand an immediate police response, *see, e.g., Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

█ This case requires us to deal with three Fourth Amendment questions: (1) whether the initial stop and brief detention of McCargo by the police was constitutional under *Terry;* (2) whether the police were entitled, as part of the *Terry* stop, to transport McCargo to the scene of the crime to see if an identification could be made by the victim; and (3) whether the police were entitled to pat down McCargo before transporting him to the crime scene in a police car. We review de novo each of

these legal questions. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *accord United States v. Singh,* 415 F.3d 288, 293 (2d Cir.2005); *see United States v. Moran Vargas,* 376 F.3d 112, 114 (2d Cir.2004). For the weapon to be admissible against McCargo, each question must be answered in the affirmative.

## II. The Initial *Terry* Stop

■ The district court held that the officers had reasonable suspicion to stop and briefly detain McCargo, short of patting him down, because of his close physical and temporal proximity to the crime scene in a high-crime area. *See Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (police may detain a suspect for further investigation upon reasonable suspicion of criminal wrongdoing). McCargo argues that the officers point to no aspect of McCargo's behavior that itself indicated criminal wrongdoing: he did not act nervous or evasive; he did not match a description of the perpetrator (in fact none existed); and, because he was crossing Berkshire with 501 Berkshire to his right, he was not walking away from the crime scene when the officers approached him.

■ We agree with the district court. *Terry* requires that a police officer have only "reasonable suspicion," *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994), that "criminal activity may be afoot" to justify an investigatory stop, *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Reasonable suspicion requires considerably less of a showing than probable cause. *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Here, based on the totality of the circumstances, the officers had a reasonable suspicion that McCargo had been involved in a crime. Responding to a 911 call at close to 1:00 a.m., the officers spotted McCargo walking alone in a high-crime area where no other pedestrians were about. *Cf. Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (a high-crime area is a relevant factor in evaluating whether police have reasonable suspicion). McCargo was 200 feet west of the crime scene, just a few minutes after the reported burglary attempt, and he was staring so intently at the police cruiser at the scene of the crime that he did not notice the officers' cruiser as it approached him.

Finally, the officers knew, based on the computer system in their car, that one of the suspects had gone to the rear of 501 Berkshire during the burglary attempt. If such a suspect had been heading north, going away from the scene of the crime, one route would have been north along Suffolk Street, the direction McCargo was walking. Thus, we believe McCargo's location supports the officers' claim of reasonable suspicion and does not detract from it, as McCargo argues.

Considering these facts in the aggregate and not in isolation, *see United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("[T]he assessment must be based upon all the circumstances . . . . and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."), we conclude that Sterlace and White had a reasonable suspicion that McCargo was involved in criminal activity and, therefore, the initial *Terry* stop was constitutional.

## III. Transportation to the Scene of the Crime

■■ Because the officers patted down McCargo only because they intended to transport him to the crime scene, the lawfulness of transporting a suspect to the crime scene as part of a *Terry* stop is placed in issue. Such a transportation is

also subject to the reasonableness requirement of the Fourth Amendment, which governs not just the fact of the *Terry* stop but its scope. "The reasonableness of a seizure under the Fourth Amendment is determined 'by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" *Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 187–88, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)); *see also United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("The touchstone of the Fourth Amendment is reasonableness . . . ."). The scope of a *Terry* stop must therefore be reasonable, but the methods police used need not be the least intrusive available. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *see United States v. Martinez–Fuerte*, 428 U.S. 543, 557 n. 12, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (rejecting least-restrictive-means analysis).

■ We have little trouble concluding that, in some circumstances, police may transport a suspect short distances in aid of a *Terry* stop. The Supreme Court has upheld such transportations, *see United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Pennsylvania v. Mimms*, 434 U.S. 106, 109–119, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), and we have held that "it is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop," *United States v. Gori*, 230 F.3d 44, 56 (2d Cir.2000); *see also United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir.1995) (sus-

pect taken to office to verify immigration status).

■ Because we have already held that the police may require a person temporarily detained under *Terry* to move to another place, the question is whether *this* transportation was reasonable. On the government's side of the scale is the strong interest in crime prevention and detection. *Cf. Place*, 462 U.S. at 704, 103 S.Ct. 2637. It was reasonable for the officers to believe that the victim might be able to identify the perpetrator. Taking McCargo to the crime scene could have immediately confirmed or dispelled whether he was a suspect. The fact that the victim had not seen any of the perpetrators was unknown to the officers. Having located a suspect and having good reason to think that he might have something to do with the crime, we think it reasonable for the police to decide to extend the *Terry* stop briefly to transport McCargo to the crime scene to see whether he could be identified by the victim. The inconvenience of doing so to McCargo, for the short time it would have taken, would present only a limited Fourth Amendment intrusion on McCargo's rights. *See Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) ("[A *Terry* stop,] justified by special law enforcement interests[,] is not confined to the momentary, on-the-street detention . . . .").

It is true that alternative means of confirming or dispelling the suspicion surrounding McCargo might have existed. Assuming there was a witness who could identify the perpetrators, the police might have walked McCargo to the crime scene or even brought the witness to McCargo. However, we do not think the officers' plan to take McCargo to the crime scene in their patrol car was unreasonable. The officers could not know whether the victim was free to move either because of a physi-

cal incapacity or the exigencies of the continuing investigation. Moving the victim to McCargo likely would have taken more time and required the use of more scarce officer resources, because one or two officers would have had to remain with McCargo while others transported the victim. Alternatively, walking McCargo to the crime scene might have meant leaving the car unattended in a high-crime area. In short, taking McCargo to the crime scene by car was reasonable under the circumstances, both by way of resolving the suspicion surrounding McCargo and impinging as little as possible on his Fourth Amendment rights.

Our view that transportation to or from the crime scene under circumstances like these would have been reasonable is consistent with the views of three of our sister courts of appeals and several state supreme courts in holding that the police may transport a suspect for identification purposes as part of a *Terry* stop. *See United States v. McCarthy*, 77 F.3d 522, 531 (1st Cir.1996) (officers detained suspect in a police car and brought a witness to the suspect in an attempt to identify him); *United States v. Dickson*, 58 F.3d 1258, 1263–64 (8th Cir.1995) (same); *United States v. Short*, 570 F.2d 1051, 1054 (D.C.Cir.1978) (suspect transported to bank for show-up before witnesses); *People v. Hicks*, 68 N.Y.2d 234, 508 N.Y.S.2d 163, 500 N.E.2d 861, 866 (1986); *People v. Bloyd*, 416 Mich. 538, 331 N.W.2d 447, 453–54 (1982); *People v. Harris*, 15 Cal.3d 384, 124 Cal.Rptr. 536, 540 P.2d 632, 636 (1975).

 Therefore, where the police have a reasonable suspicion that a person was involved in a crime, they do not violate the Fourth Amendment rights of a suspect if they stop the suspect and transport him a short distance to the scene of the crime in furtherance of a legitimate law-enforcement purpose. We also believe that the police may reasonably choose to transport the suspect in a police car where, as here, that decision would shorten the length of the Fourth Amendment intrusion.

## IV. The Frisk

 The officers patted down McCargo preparatory to placing him in the police car to transport him to the crime scene and, in so doing, found the handgun that formed the basis for the charges against him and that McCargo wants suppressed. *Terry* itself specifically authorized a pat-down where, following a stop, the officers believed that the person detained was armed, *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. The pat-down here, however, was pursuant to a policy of the Buffalo Police Department that required pat-downs before transporting any person in a police car to ensure officer safety. Thus, the question we must answer is whether a suspect may be frisked in certain circumstances as part of a *Terry* stop without officers' relying on a reasonable suspicion that he is armed.[1] The answer requires an examination of *Terry* and its progeny as well as those cases in which the Fourth Amendment permits suspicionless searches or seizures. The fundamental command of the Fourth Amendment is that governmental intrusions on persons be reasonable, and, as *Terry* explained, the "limitations [on protective searches and seizures] will have to be developed in the concrete factual circumstances of individual cases." *Id.* at 29, 88 S.Ct. 1868.

---

1. In an amicus brief filed by the other United States Attorneys in this circuit, the government argues that the officers had a reasonable suspicion that McCargo was armed. Because we resolve this case on other grounds, we decline to address this argument.

The touchstone of our analysis is still *Terry*. While in *Terry* the suspect patted down was suspected of being armed and thus *Terry* does not control this case on its facts, the reasoning of *Terry* leads us to the conclusion that the pat-down of McCargo did not violate his Fourth Amendment rights. In *Terry*, the Court held that police may frisk a person if they have a reasonable belief that the person is armed and dangerous. *Id.* Paramount in the Court's reasoning was that the Fourth Amendment should not require the police to investigate crime with their safety unduly at risk. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. . . . We cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Id.* at 23–24, 88 S.Ct. 1868. Weighing this important interest in police and public safety against the "brief, though far from inconsiderable," intrusion on an individual's privacy, *id.* at 26, 88 S.Ct. 1868, the Court concluded that a frisk for weapons was permissible.

■ A interest in officer safety has been the justification for *Terry* stops from their inception. Our examination of *Terry's* progeny reaffirms this conclusion. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) ("[P]rotection of the police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . . ."); *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("[A] law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons . . . ."); *Mimms*, 434 U.S. at 110, 98 S.Ct. 330 ("We think it too plain for argument that the State's proffered justifica-

tion—the safety of the officer—is both legitimate and weighty."). The lesson we take from these cases is that the strictures of the Fourth Amendment must not be so burdensome as to impose unreasonable and avoidable risks on police officers during their investigations.

In the typical *Terry* stop, we have no doubt that the powers the police possess over the suspect, including the power to order the suspect to move to a more convenient or safer location, *see Place*, 462 U.S. at 706, 103 S.Ct. 2637; *Mimms*, 434 U.S. at 110–11, 98 S.Ct. 330, adequately protect the important state interest in the safety of police officers and others. There are important differences, however, between the typical *Terry* stop where the suspect is detained on the street and this case where the suspect is to be transported in the back of a patrol car. In the typical case on the street, the officers have the ability to terminate the stop or arrest the suspect at any moment and to control the location of the stop to minimize the danger the suspect poses to the police and others.

The transportation of the suspect in the back of a police car as part of the *Terry* stop is markedly different. The officers are less able to protect themselves from the possibility of violence. The officers cannot depart or remove themselves temporarily from the situation and call in additional officers as backup. The suspect and the officers are in close proximity to each other for the duration of the transportation; the suspect sits behind them, a few feet away in the rear of the car, frequently separated by only a wire grate. And the suspect is not subject to the officers' immediate physical control or restraint: if the suspect turns out to be armed, the police are at his mercy.

In sum, we think the dangers posed to police officers in situations where a sus-

pect, who may be armed, is placed in the rear of a police car are substantially different and greater than those posed in the typical *Terry* stop. The increased threat to police safety informs the balance to be struck between the safety interests of the police and the privacy interests of individuals. *See Camara v. Mun. Ct.,* 387 U.S. 523, 534–35, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *see also Terry,* 392 U.S. at 9, 88 S.Ct. 1868 ("Of course, the specific content and incidents of [Fourth Amendment rights] must be shaped by the context in which [they are] asserted. For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" (quoting *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960))).

Permitting a limited frisk for weapons before placing a suspect in a police car, pursuant to an established policy, reflects an appropriate balancing of the interests at stake. Because the suspect is placed in the rear of the car—a location where, were he armed, he would expose the officers to peril—we think the most reasonable, and least intrusive, solution is to permit a pat-down for weapons. The possibility of danger to the officers can be eliminated simply by ensuring that the suspect does not have a weapon that can be used against them.

The justification for the pat-down is not that the suspect is reasonably suspected of being armed; it is rather a matter of sound police administration: police officers should be certain before transporting members of the public, whom they do not know, that none of them is armed. The administrative nature of the search is evidenced by the existence of the Buffalo Police's department-wide policy that requires the pat-down whenever a person is transported in a police car. The fact that the policy is administrative and universally applied to all who are transported eliminates any selective-use concern. *See Brown,* 443 U.S. at 51, 99 S.Ct. 2637.

Courts have long upheld suspicionless searches conducted under an official policy as not violative of the Fourth Amendment. Although the reasonableness balance differs following an arrest, permitting greater intrusion, post-arrest administrative searches are justified, not by probable cause or suspicion, but by the same safety rationale applicable in this case. *See Colorado v. Bertine,* 479 U.S. 367, 373–74 & n. 6, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

> Arrested persons have also been known to injure themselves—or others—with belts, knives, drugs or other dangerous items on their person while being detained. Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession. The bare recital of these mundane realities justifies reasonable measures by police to limit these risks....

*Illinois v. Lafayette,* 462 U.S. 640, 646, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). Similarly, non-discretionary inventory searches of vehicles are constitutional, without any quantum of suspicion, in order to protect the police from the potential danger posed by items left behind. *South Dakota v. Opperman,* 428 U.S. 364, 369, 374–75, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Suspicionless searches are permissible in other instances, as well, where special governmental interests outweigh the individual's liberty interest. *See, e.g., Mich. Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (drunk-driving checkpoint); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (immigration checkpoint); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87

**202**

(1972) (closely regulated businesses); *Camara*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (administrative searches); *Nicholas v. Goord*, 430 F.3d 652 (2d Cir. 2005) (DNA extraction from inmates).

■ Our holding in this case is a narrow one. We are not holding that the police are entitled to pat down a person, absent reasonable suspicion that he is armed, simply because they have stopped that person pursuant to a lawful *Terry* stop. However, in cases where the police may lawfully transport a suspect to the scene of the crime in the rear of a police car, the police may carry out a departmental policy, imposed for reasons of officer safety, by patting down that person. Because the police must have a legitimate law-enforcement reason to transport a suspect, we see little danger that policies such as these might be used as a pretext for a suspicionless frisk.

Applying these rules to this case is now straightforward. We have already said that McCargo was lawfully stopped and that the police were entitled to transport McCargo to the scene of the crime. The officers testified, and the district court found, that the officers frisked McCargo pursuant to a generally applicable police policy that required all persons placed in patrol cars to be frisked. There are no allegations, much less proof, of bad faith or pretext on the part of the police. Therefore, the frisk of McCargo was constitutional, and the judgment of the district court should be reversed.

### CONCLUSION

For the reasons set forth above, the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.