TJOFLAT, Circuit Judge:
Johnny Marshall appeals the District Court’s denial of his petition for a writ of habeas corpus seeking to vacate, pursuant to 28 U.S.C. § 2254, his Florida conviction and sentence for armed robbery with a firearm. The issue before the District Court and now on appeal is whether the Florida courts unreasonably applied the Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in concluding that Marshall’s attorney did not render ineffective assistance of counsel by failing to move the trial court to suppress an eyewitness identification on the ground that it was obtained in violation of the Fourth Amendment.[1] The District Court concluded that the Florida courts’ application of Strickland was not unreasonable. We agree and accordingly affirm.
I.
A.
On June 15, 1998, a Pizza Hut take-out and delivery facility on Overlook Drive in Winter Haven, Florida was robbed. Around 10:50 p.m., ten minutes before the Pizza Hut was set to close, a man walked inside, apparently to place an order for a large cheese pizza. Geraldine Jenkins, an employee of Pizza Hut, was the only person in the restaurant at the time and was occupied in the back of the building.[2] Jenkins eventually came out to greet the man and took his order. When Jenkins told the man the price for the pizza, he stared at her. Jenkins repeated the price, and in response, the man lifted up his shirt to display a gun placed inside the waistband of his pants. He asked her, “Do you know what this is?” Jenkins responded that she did. The man told Jenkins that he wanted money. Jenkins took money out of the cash register, counting it slowly so as to stall for time for the delivery driver to return from a delivery. The man told Jenkins that she did not need to count the money — that he would count it at home. Jenkins gave him the money, around $260, and he told her to turn around with her hands down *1280 and walk toward the back of the building as he exited. After he left, Jenkins pressed the alarm. She then tried to phone her manager with no luck. Reaching her assistant manager, she explained what had happened. She then called her husband, who called the police.
Deputy Thomas Van Sciver of the Polk County Sheriffs Office arrived soon thereafter and took a description of the perpetrator from Jenkins. Jenkins described the perpetrator as a black man, around the age of twenty-two, with a height of approximately 5'4", weighing approximately 115 pounds, dark-skinned, brown-eyed, with black hair and wearing a maroon shirt, black pants, and a white hat. Deputy Van Sciver issued a “Be on the Lookout” warning (“BOLO”) with Jenkins’s description of the man to the police officers in the area.
Around midnight, Deputy Darrell Horne, also of the Polk County Sheriffs Office, was dispatched to investigate a suspicious vehicle in an industrial park with closed warehouses and repair shops about a half of a mile from the Pizza Hut.[3] Deputy Horne drove his squad car to investigate and found Marshall and Benjamin Ivey in a truck in front of a closed auto-repair shop. The truck had no license plates, but instead had a piece of cardboard in the window.[4] Deputy Horne initiated a Terry stop. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[5] Marshall — a thirty-two-year-old light-skinned black man, 5'8" in height, and weighing around 180 pounds — emerged from the driver’s side of the vehicle. He was shirtless, wearing black shorts, sweating profusely, and appeared nervous. Ivey, also a black man wearing black shorts, exited the vehicle. Deputy Horne asked the two men what they were doing, and they explained that they had been changing a flat tire. Deputy Horne patted down the two men and did a cursory search of the truck for officer safety. Deputy Horne did not find any weapons on the two men or in the truck, but did find a purple t-shirt. Deputy Horne called the on-scene supervisor, Lieutenant Mike Bass, who was at the Pizza Hut, to inform him of his findings and Bass instructed Horne to bring the two men to the Pizza Hut for a possible identification.
Deputy Horne handcuffed Marshall and Ivey and put them in the backseat of his squad car. He drove them to the Pizza Hut, where the officers informed Jenkins that she should not assume that either of the men was suspected of the crime but that if she saw the perpetrator, she should identify him. At this point, between an hour and an hour and a half had passed from the time of the robbery. The two men remained in the backseat of the squad car while Jenkins looked at them through a rear-door window, Marshall having donned the purple t-shirt.[6] Within two or three seconds, Jenkins identified Marshall as the perpetrator of the crime (the “Pizza Hut *1281 identification”), later stating that she had identified him by his eyes.[7] Fingerprints were found at the scene of the crime, but none usable for comparison purposes were Marshall’s or Ivey’s.
Five months later, on November 18, 1998, Jenkins was shown a photo array containing Marshall’s photo, wearing the same purple t-shirt that he was wearing on the night of the robbery. There was one other man in the photo array wearing a purple article of clothing — a purple warmup shirt. Jenkins again identified Marshall as the perpetrator of the crime.
B.
On August 25, 1998, an amended information was filed in the Circuit Court of Polk County, Florida, charging Marshall with armed robbery. After James Mel McKinley of the Public Defender’s Office was appointed to represent him, Marshall pled not guilty and, from August 23-25, 1999, stood trial before a jury. Jenkins testified for the State and again identified Marshall as the perpetrator of the crime. He was convicted, and the court sentenced him to life imprisonment as a prison-release reoffender.[8] Marshall appealed his sentence to the Second District Court of Appeal of Florida (“DCA”).[9] The court affirmed the conviction on September 15, 2000 as a summary disposition.[10]
C.
On October 25, 2002, Marshall, proceeding pro se, moved the Circuit Court to vacate his conviction under Rule 3.850.[11] His motion presented five grounds for relief, including the one before us here — that his attorney rendered ineffective assistance of counsel under Strickland in failing to file a pretrial motion to suppress the Pizza Hut identification on the theory that it was obtained in violation of the Fourth Amendment, i.e., an illegal stop, arrest, and detention.
After the court, acting sua sponte, appointed Byron Hileman to represent Marshall, it held an evidentiary hearing on October 12, 2097. Three witnesses testified at the hearing: Marshall, McKinley, and Ronald Toward, an expert in the field of criminal defense.
McKinley, Marshall’s trial attorney, testilled that, at that time of Marshall’s trial, he had twenty-seven years of experience as a lawyer, the last fourteen of which he served as an Assistant Public Defender. He stated that he had considered whether Deputy Horne’s stop of Marshall and Ivey in the industrial park and his transportation of the two men to the Pizza Hut was illegal under the Fourth Amendment but concluded that it was not. Marshall testified that McKinley had told him that *1282 “there was nothing to suppress.” Hileman, Marshall’s collateral attorney, “candidly admitted ... that ... there were circumstances that ‘probably justified’ a Terry stop in this case, [and that he] would be focusing on whether [trial] counsel should have filed a motion to suppress based upon a claim that the Defendant’s detention was illegally prolonged.” Toward opined as an expert that he would have moved to suppress the Pizza Hut identification pretrial for the same reason.
The Circuit Court denied Marshall’s Rule 3.850 motion on January 2, 2008. “After reviewing the depositions of Deputy Van Sciver, Deputy Horne, Lieutenant Bass, and Ms. Jenkins, ... as well as the testimony and evidence adduced at the hearing regarding what defense trial counsel knew at the time,” the court, applying Strickland, concluded that Marshall had not established that McKinley’s failure to file a motion to suppress was deficient performance resulting in “an error ‘so serious that he ... was not functioning as the counsel guaranteed by the Sixth Amendment.’ ” The court observed that it was “undisputed that counsel consciously reviewed the [suppression] issue[ ] and then made the tactical and strategic decisions not to pursue ... the motion to suppress .... ‘[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.’ ” Turning to Strickland’s required prejudice analysis, the court held that Marshall’s claim failed to prove that “even if counsel had filed [a] motion to suppress, such a motion had a reasonable probability of success.”
Marshall appealed the Circuit Court’s Strickland ruling to the DCA. Marshall argued that McKinley should have moved the court to suppress the Pizza Hut identification based solely on his half-hour detention following the Terry stop. The DCA affirmed the Circuit Court’s ruling per cu-riam without a written opinion on September 18, 2009.
D.
On October 18, 2010, Marshall filed his § 2254 petition in the United States District Court for the Middle District of Florida, presenting the same ineffective-assistance claim he had presented to the DCA. Specifically, Marshall argued that McKinley should have moved to suppress the Pizza Hut identification because the initial Terry stop was impermissibly extended so that it grew into a full-fledged illegal arrest without probable cause. Marshall argued that the failure to file the motion prejudiced his case, “because there was a reasonable probability that had this issue been litigated the outcome of [his] case would have been different due to the eyewitness identification testimony being the only link between the robbery and [him].” The State, in response, contended that counsel’s performance was not objectively unreasonable under Strickland.[12]
The District Court, applying the Antiter-rorism and Effective Death Penalty Act of 1996 (“AEDPA”),[13] specifically 28 U.S.C. § 2254(d), considered whether Marshall had shown that the DCA’s decision was “(1) ... contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) ... based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” The court concluded that based on the record before the Polk County Circuit *1283 Court in the Rule 8.850 proceeding, and thus the DCA, Marshall had failed to make either showing and therefore denied the writ. We granted Marshall a certificate of appealability (“COA”), framing the issue as “[w]hether the state courts unreasonably applied Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in concluding that Marshall’s trial counsel did not provide constitutionally ineffective assistance by failing to move to suppress the evidence of the ‘show-up’ identification of Marshall.”
II.
In his opening brief on appeal, Marshall argues[14] that McKinley’s performance was deficient under Strickland because he failed to move the Circuit Court pretrial to suppress the Pizza Hut identification on the ground that the identification was the fruit of a Fourth Amendment violation, i.e., Deputy Horne’s illegal stop in the industrial park, his subsequent arrest without probable cause, and his transportation to the Pizza Hut. At the evidentiary hearing on his Rule 3.850 motion, Marshall conceded that the stop was permissible under Terry, and he did not question the validity of the stop in his appeal to the DCA. Marshall argued, instead, that his detention and transportation to the Pizza Hut fell beyond Terry’s reach. That is the argument the District Court entertained when it found that the DCA did not unreasonably apply Strickland and Terry,[15] And it is the argument we entertain here.
We assess Marshall’s argument in the same way the District Court did.[16] As AEDPA instructs, we determine whether Marshall has demonstrated that the DCA’s affirmance of the Circuit Court’s denial of his Strickland claim
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the *1284 Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d). Marshall does not contend that the DCA’s decision was based on an unreasonable determination of the facts. Rather, his argument is that the decision constituted an unreasonable application of clearly established Federal law, i.e., Strickland.
Under § 2254(d)(1), “ ‘clearly established Federal law, as determined by the Supreme Court of the United States’ ... refers to the holdings, as opposed to the dicta, of th[e] Court’s decisions as of the time of the relevant state-court decision.” Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000) (quoting 28 U.S.C. § 2254(d)(1)). “ ‘A state court decision involves an unreasonable application of [a] Supreme Court [holding] “if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner’s case.” ’ ” Overstreet v. Warden, 811 F.3d 1283, 1286 (11th Cir. 2016) (third alteration in original) (first quoting Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000), and then quoting Williams v. Taylor, 529 U.S. 362, 407-08, 120 S.Ct. 1495, 1520, 146 L.Ed.2d 389). For “a state court’s application of [Supreme Court] precedent” to be “ ‘unreasonable,’ the state court’s decision must have been more than incorrect or erroneous. The state court’s application must have been ‘objectively unreasonable.’ ” Wiggins v. Smith, 539 U.S. 510, 520-21, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) (citations omitted). “[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.” Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (first alteration in original) (emphasis added) (quotation marks omitted) (quoting Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009)). And “even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.” Id. at 102, 131 S.Ct. at 786.
As these cases demonstrate, § 2254(d) “is a ‘difficult to meet’ and ‘highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.’ ” Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (citation omitted) (quoting Richter, 562 U.S. at 102, 131 S.Ct. at 786 and Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (per curiam)).
When a petitioner makes an ineffective-assistance-of-counsel claim, the relevant Supreme Court law under 28 U.S.C. § 2254(d)(1) is Strickland v. Washington. To succeed on a Strickland claim, the petitioner has to show both that his counsel’s performance was deficient and that that deficient performance was prejudicial— that is, that there is a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 687, 694, 104 S.Ct. at 2064, 2068.
“There is a strong presumption that counsel’s performance falls within the ‘wide range of professional assistance’^] the defendant bears the burden of proving that counsel’s representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.” Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. at *1285 2065). “[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
Where, as here, the relevant allegation is that counsel “fail[ed] to litigate a Fourth Amendment claim competently ... the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.” Morrison, 477 U.S. at 375, 106 S.Ct. at 2583 (emphasis added).
“The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.” Overstreet, 811 F.3d at 1287 (quotation marks omitted) (quoting Richter, 562 U.S. at 105, 131 S.Ct. at 788). Under § 2254, we must evaluate the highest state-court decision that evaluated the claim “on the merits.” 28 U.S.C. § 2254(d); Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008). Here, that is the DCA’s per curiam affirmance of the Rule 3.850 trial court’s denial of the Rule 3.850 motion. See Pinholster, 563 U.S. at 187-88, 131 S.Ct. at 1402; Richter, 562 U.S. at 98, 131 S.Ct. at 784. Because the DCA did not give reasons for its summary affirmance, if there was any reasonable basis for the state court to deny relief, we are bound to affirm the denial of the petition. Pinholster, 563 U.S. at 187-88, 131 S.Ct. at 1402; Richter, 562 U.S. at 98, 131 S.Ct. at 784.
With the foregoing principles in hand, we proceed to evaluate Marshall’s claim that McKinley was ineffective under Strickland in failing to seek the suppression of the Pizza Hut identification.
III.
Marshall contends that the Terry stop evolved into a full-fledged arrest without probable cause; therefore, McKinley was constitutionally deficient in failing to move the trial court to suppress the Pizza Hut identification as fruit of an illegal arrest. The problem with Marshall’s argument is that he cannot show that Supreme Court law at the time held that his seizure went beyond the scope of a Terry stop and into the realm of an illegal arrest. Absent such showing, he cannot establish that the DCA’s rejection of his Strickland claim constituted “an unreasonable application of, clearly established Federal law.” 28 U.S.C. § 2254(d)(1).
At the time Marshall’s conviction became final, the Supreme Court cases most closely on point were Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion), and Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).[17] In Dunaway, the *1286 Supreme Court held that a violation of the Fourth Amendment occurred when police seized the defendant without probable cause and transported him to a police station for interrogation. 442 U.S. at 216, 99 S.Ct. at 2258. In finding there to be a Fourth Amendment violation, the Supreme Court focused on the facts that the defendant was “transported to a police station and placed in an interrogation room.” Id. at 212, 99 S.Ct. at 2256. The Supreme Court later identified “[t]he pertinent facts relied on by the Court in Dunaway” to be that: “(1) the defendant was taken from a private dwelling; (2) he was transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation resulting in a confession.” United States v. Sharpe, 470 U.S. 675, 684 n. 4, 105 S.Ct. 1568, 1574 n. 4, 84 L.Ed.2d 605 (1985). None of those facts is present here.
Similarly, in Royer, the Fourth Amendment was violated when, without probable cause, police transported the defendant to a police room in an airport and searched his luggage. 460 U.S. at 494, 507, 103 S.Ct. at 1322, 1329. Nonetheless, the Court stated that “there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention.” Id. at 504, 103 S.Ct. at 1328.
In Hayes, a Fourth Amendment violation occurred when police transported the defendant to a police station without probable cause for fingerprinting. 470 U.S. at 814-15, 105 S.Ct. at 1646. There the Court reiterated “that transportation to and investigative detention at the station house without probable cause or judicial authorization together violate the Fourth Amendment.” Id. at 815, 105 S.Ct. at 1646 (emphasis added). The Court went on to state that its
view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.
Id. at 816, 105 S.Ct. at 1647 (emphasis added).
Dunaway, Royer, and Hayes each involved the transportation of the defendant beyond the initial site of the stop without probable cause, as we assume happened here. However, in stark contrast to the present case, in each of these cases the defendant was transported to a police station or official room for questioning or fingerprinting. None of these cases involves a defendant being transported a *1287 short distance — less than a mile — to the scene of a crime for possible identification.
Further lending support to the proposition that Supreme Court law was, and still remains, murky as to whether the Fourth Amendment is violated when a defendant is transported to a crime scene for identification purposes as part of a Terry stop is a case from our sister circuit: United States v. McCargo, 464 F.3d 192 (2d Cir. 2006). In McCargo, the Second Circuit found there to be no Fourth Amendment violation when police had planned to transport the defendant to the scene of an attempted burglary for identification purposes.[18] 464 F.3d at 195, 199. First, the Second Circuit held that the officers had a reasonable, articulable suspicion to stop the defendant because they “spotted [the defendant] walking alone in a high-crime area where no other pedestrians were about.” Id. at 197. It was just a few minutes after the burglary attempt and the defendant was only two hundred feet away from the crime scene. Id. With regard to the legality of the planned transportation for identification purposes, the Second Circuit held that “having good reason to think that [the suspect] might have something to do with the crime, we think it reasonable for the police to decide to extend the Terry stop briefly to transport [the defendant] to the crime scene to see whether he could be identified by the victim.” Id. at 198. According to the Second Circuit, if “the police have a reasonable suspicion that a person was involved in a crime, they do not violate the Fourth Amendment rights of a suspect if they stop the suspect and transport him a short distance to the scene of the crime in furtherance of a legitimate law-enforcement purpose.”[19] Id. at 199.
It makes good sense for transportations for identification to be allowable as part *1288 and parcel of Terry stops. The purpose of a Terry stop is to verify or dispel the officer’s suspicion of wrongdoing as soon as possible so that the stopped person is quickly free to continue on his way. See Royer, 460 U.S. at 500, 103 S.Ct. at 1325-26. Minimally invasive transportations for identification like the ones in McCargo and here are completed quickly and with minor inconvenience to the defendant. If the defendant is not identified, he is free to continue on his way. If he is identified, the police may have apprehended the criminal quickly.
“Admittedly,” there may be some “difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest. Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.” Sharpe, 470 U.S. at 685, 105 S.Ct. at 1575. But the Supreme Court has declined' to apply a rigid rule when determining whether a seizure is appropriately analyzed as a Terry stop or an arrest. United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988) (“[I]n distinguishing a true investigative stop from a de facto arrest, we must not adhere to ‘rigid time limitations’ or ‘bright line rules.’ ” (quoting Sharpe, 470 U.S. at 685, 105 S.Ct. at 1575)). At the time Marshall’s conviction became final, none of the Supreme Court cases discussing transportation of a defendant without probable cause confronted the situation here, where the defendant was transported to the scene of a crime for the purpose of identification. Rather, all of the available cases discuss transportation, either directly or indirectly, to an official police room for questioning or fingerprinting. No Supreme Court law extant at the time Marshall’s conviction became final declared that a Terry stop like the one here constituted a full-blown arrest. McKinley reviewed the issue and could have reasonably concluded that a motion to suppress the Pizza Hut identification would have failed.
Alternatively, McKinley’s failure to file a motion to suppress on Fourth Amendment grounds did not render his' performance deficient because Marshall could not show that the Fourth Amendment exclusionary rule would unquestionably have barred the Pizza Hut identification even if the detention and transportation violated the Fourth Amendment. The exclusionary rule precludes the introduction into evidence of the fruit of a search or seizure in violation of the Fourth Amendment. Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S.Ct. 407, 415-16, 9 L.Ed.2d 441 (1963). However, not
all evidence is “fruit of the poisonous tree” simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.
Id. at 487-88, 83 S.Ct. at 417 (quotation marks omitted).
The Supreme Court cases at the time that come closest to showing that an identification made after the defendant has been illegally detained would have been suppressed are Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), and United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). In Johnson, the Supreme Court held that a line-up identification obtained following an illegal arrest need not have been excluded because the identification had not been obtained by exploiting the illegal arrest; instead, it had been obtained under circumstances that purged the pri *1289 mary taint of the illegal arrest. 406 U.S. at 365, 92 S.Ct. at 1626. Those circumstances were the defendant’s representation by counsel and presentation before a magistrate judge to advise him of his rights and to set bail. Id. In Crews, the Supreme Court held that an in-court identification of a defendant by a victim did not need be suppressed as fruit of an illegal arrest, because the victim’s identification did not stem from the police’s illegal conduct. 445 U.S. at 470-73, 100 S.Ct. at 1249-51.
Additionally, a case from the former Fifth Circuit[20] illuminates Supreme Court law at the relevant time: Passman v. Blackburn, 652 F.2d 559 (5th Cir. Unit A 1981). In Passman, two men, later identified as Walter Burnette and Glenn Pass-man, gained entry to a home, committing robbery and sexual assault. Id. at 563-64. The two men fled the home, and a description of them was radioed to police in the area. Id. at 564. That night, Passman was arrested in his home and taken to the police station, where he was identified by a member of the family as one of the perpetrators of the crimes. Id. at 564-65. The former Fifth Circuit held that even though probable cause to arrest Passman was lacking, evidence that a family member identified him following his arrest on the night of the crime was not fruit of an illegal arrest that had to be excluded because the identification stemmed from the family member’s personal identification of the defendant, not from the illegal arrest.[21] Id. at 565.
Here, McKinley, a lawyer with twenty-seven years of experience and fourteen years of experience at the Public Defender’s office, could have reasonably believed that the Pizza Hut identification was not fruit of an illegal seizure because, as in Passman, an independent source for the identification existed: namely, Jenkins’s observation of Marshall.[22] Cf. Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc) (“When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.”). The identification of Marshall arguably did not derive from the seizure and transportation, rather, it plausibly derived from Jenkins’s close-up[23] “personal observation” of Marshall and her very specific memory of his eyes. See id.
Overall, Marshall had a plausible Fourth Amendment claim, but even “a *1290 good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under Strickland that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ.” Morrison, 477 U.S. at 382, 106 S.Ct. at 2586-87; see also Richter, 562 U.S. at 102, 131 S.Ct. at 786 (“It bears repeating that even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be.” (citation omitted)). Assuming that Marshall has shown that his seizure without probable cause was in violation of the Fourth Amendment, he has not established that the Pizza Hut identification would have been suppressed as fruit of the illegal seizure. See Woods v. Donald, 575 U.S.-,-, 135 S.Ct. 1372, 1377, 191 L.Ed.2d 464 (2015) (per curiam) (“[W]here the precise contours of [a] right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner’s claims.” (second alteration in original) (quotation marks omitted) (quoting White v. Woodall, 572 U.S.-,-, 134 S.Ct. 1697, 1705, 188 L.Ed.2d 698 (2014))); cf. id. (noting that because no Supreme Court “cases confront ‘the specific question presented by this case,’ the state court’s decision could not be ‘contrary to’ any holding from [the Supreme Court.]” (quoting Lopez v. Smith, 574 U.S. ——, , 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per cu-riam))). Therefore, the DCA could have reasonably determined that McKinley was not ineffective in failing to pursue a motion to suppress the Pizza Hut identification. Cf. Strickland, 466 U.S. at 690, 104 S.Ct. at 2066 (“[Sjtrategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.”). The DCA’s decision that McKinley was not ineffective for failing to pursue a motion to suppress the Pizza Hut identification based on a violation of the Fourth Amendment was not an unreasonable application of Supreme Court law. Because Marshall has not shown that McKinley rendered deficient performance, we need not reach the issue of prejudice.
IV.
For the foregoing reasons, the District Court’s denial of Marshall’s petition is AFFIRMED.
AFFIRMED.

. The Fourth Amendment is applicable to the states by virtue of its incorporation through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961).

. The following facts describing what occurred during the robbery derive primarily from Geraldine Jenkins's testimony at trial.

. The following facts derive primarily from Deputy Horne’s testimony at trial.

. Deputy Horne testified that ''[q]ommonly, people ... put those cardboard plates in their window. Once they, like, lose a tag and they know their tag number, and they would write their tag number on that cardboard plate and display it. But it’s not an actual plate.”

. Under Terry, the Supreme "Court carved out an exception to the Fourth Amendment's default rule that all seizures must be supported by probable cause and held that officers could 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.’ ” United States v. Valerio, 718 F.3d 1321, 1324 (11th Cir.2013) (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000)).

.There is some dispute about whether Marshall was directed to put on the t-shirt or whether he did so voluntarily.

.Jenkins stated that she had particularly noticed the perpetrator’s eyes during the commission of the crime because they struck her as "very scary, very big.” In her deposition, Jenkins said of Marshall's eyes: "I do know one thing, if I ever see his eyes and his face again I would remember.” When asked, “What was it that made Pier] think [that Marshall] was the same person [as the perpetrator]?” Jenkins responded, “Because of his eyes. ... Just big brown eyes that — sort of like sunken in. ... It was really spooky, spooky eyes.” When discussing her future presence at trial, Jenkins, distressed, stated, "I see this man in my sleep so many times, his eyes, his face.”

. See Fla. Stat. § 775.082(9)(a)(l)-(3).

. Jennifer Fogle of the Public Defender’s Office represented Marshall on appeal to the DCA.

. Marshall did not seek review in the Supreme Court of Florida or the Supreme Court of the United States.

. Marshall filed the motion pro se, but received the assistance of court-appointed counsel to prosecute the motion.

. The State also argued that Marshall's petition was untimely under 28 U.S.C. § 2244(d). The District Court rejected the argument. The State abandoned the argument in briefing the instant appeal.

. See 28 U.S.C. § 2241 et seq.

.Marshall’s opening brief was filed pro se. After the State filed an answer brief, counsel was appointed for Marshall, and counsel filed another opening brief on behalf of Marshall. The State responded with another answer brief, and counsel filed a reply brief. Prior to oral argument, because Marshall’s counseled brief did not contain an argument that McKinley’s failure to raise the Fourth Amendment claim was ineffective but, instead focused on a claim Marshall had not presented to the DCA and raised in his § 2254 petition — that McKinley was ineffective for failing to move to suppress the Pizza Hut identification as impermissibly suggestive in violation of the due process clause of the Fourteenth Amendment — we ordered the parties either to adopt their original briefs (Marshall's pro se brief and the State's answer brief) or provide supplemental briefing on the Fourth Amendment issue stated in the COA. Marshall's attorney adopted Marshall's opening pro se brief, and the State filed an answer brief. Therefore, Marshall’s pro se brief and the State’s answer brief, both submitted in response to our order, are the operative briefs on appeal.

. Marshall also argues that his detention and transportation to the Pizza Hut was illegal under Florida’s “Stop and Frisk Law,” Fla. Stat. § 901.151, and that McKinley’s failure to challenge the Pizza Hut identification on this ground constituted ineffective assistance. Marshall did not cite this as a ground for Rule 3.850 relief; nor did he raise the point in his brief to the DCA. The argument is unexhaust-ed and procedurally defaulted. See Ward v. Hall, 592 F.3d 1144, 1156 (11th Cir. 2010) ("[I]n order to exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state’s highest court, either on direct appeal or on collateral review.”).

. The District Court reached its decision by looking over the DCA’s shoulder, so to speak, to see whether the DCA’s application of Strickland was unreasonable under 28 U.S.C. § 2254(d)(1). Whether the DCA applied Strickland reasonably is a mixed question of law and fact, and we review the District Court’s determination de novo. See Overstreet v. Warden, 811 F.3d 1283, 1286 (11th Cir. 2016) (citing Pardo v. Sec'y, Fla. Dep’t of Corr., 587 F.3d 1093, 1098 (11th Cir. 2009)).

. In his pro se brief, Marshall also points us to Kaupp v. Texas, 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (per curiam), and United States v. Virden, 488 F.3d 1317 (11th Cir. 2007). However, the law that we are to consider when evaluating the DCA’s decision is Supreme Court holdings that existed at the time that the conviction became final. 28 U.S.C. § 2254(d)(1); Williams, 529 U.S. at 390, 120 S.Ct. at 1511. Marshall’s conviction became final in 2000, meaning that neither the trial court nor the DCA had these cases available to them when considering Marshall’s Strickland claim. And, Eleventh Circuit law, though useful in illuminating Supreme Court law at the time, is not decisive when evaluating the DCA’s application of Supreme Court law. In any event, Kaupp is distinguishable from the case at hand. In Kaupp, a Fourth Amendment violation was found where police arrested the defendant in his home in the middle of the night without probable cause and, while transporting him to the police station for questioning, stopped briefly at a crime scene where a body had been recently found. 538 U.S. at 628-29, *1286 123 S.Ct. at 1845. The Supreme Court stated that "[s]uch involuntary transport to a police station for questioning is 'sufficiently like ar-res[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.’ ” Id. at 630, 123 S.Ct. at 1845 (emphasis added) (second alteration in original) (quoting Hayes, 470 U.S. at 816, 105 S.Ct. at 1647). The instant case is distinguishable from Kaupp because here, Horne’s primary goal was to transport Marshall and Ivey to the Pizza Hut for identification, rather than to a police station for questioning.
In Virden, the defendant’s vehicle was seized without probable cause in violation of the Fourth Amendment when the police transported it and the defendant to another location to perform a canine sniff. 488 F.3d at 1320-22. In Virden, admittedly, it appears that we have held that investigatory transpor-tations transcend the allowable scope of a Terry stop. 488 F.3d at 1321. Nonetheless, this does not show that the Supreme Court had foreclosed these transportations. Under AED-PA, when "the precise contours of [a] right remain unclear, state courts'enjoy broad discretion in their adjudication of a prisoner’s claims.” Woods v. Donald, 575 U.S. -, -, 135 S.Ct. 1372, 1377, 191 L.Ed.2d 464 (2015) (per curiam) (alteration in original) (quotation marks omitted) (quoting White v. Woodall, 572 U.S.-,-, 134 S.Ct. 1697, 1705, 188 L.Ed.2d 698 (2014)).

. Prior to transporting the defendant, the officers performed a pat-down for officer safety pursuant to the police department’s policy requiring pat-downs before placing individuals in police vehicles. United States v. McCargo, 464 F.3d 192, 196 (2d Cir. 2006). The officers discovered a gun in the defendant’s waistband, and the defendant was arrested and taken to police headquarters. Id. The defendant was therefore never taken to the site of the burglary. He was indicted for possessing a firearm as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Id. The Second Circuit assumed that the officers did not have a reasonable suspicion that the defendant was armed but instead considered whether the pat-down could be justified solely on the departmental policy and the special interests at stake when transporting suspects. Id. at 199. Therefore, preliminary to the question of whether the pat-down was legal was the question of whether the planned transportation was legal. Id. The Second Circuit ultimately held that
in cases where the police may lawfully transport a suspect to the scene of the crime in the rear of a police car, the police may carry out a departmental policy, imposed for reasons of officer safety, by patting down that person. Because the police have a legitimate law-enforcement reason to transport a suspect, we see little danger that policies such as these might be used as a pretext for a suspicionless frisk.
Id. at 202.

. The Second Circuit in McCargo cites two Supreme Court cases to support this statement: United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). Place held that property may be temporarily seized without probable cause in accordance with Terry. Though ultimately concluding that the limits of a Terry stop had been exceeded in that case, the Supreme Court briefly entertained the idea that a transportation in some circumstances need only be supported by a reasonable, articula-ble suspicion of wrongdoing: ’’[T]he police may confine their investigation to an on-the-spot inquiry[ ] ... or transport the property to another location.” Place, 462 U.S. at 705-06, 103 S.Ct. at 2643-44. In Mimms, a police officer ordered a driver out of a vehicle during a Terry stop. 434 U.S. at 109, 98 S.Ct. at 332.

. Cases of the former Fifth Circuit handed down before October 1, 1981 have been adopted as binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (enbanc).

. The Passman Court stated that the identification "ha[d] a source independent of the illegal seizure,” that is, the family member's "face to face contact with” Passman. Passman, 652 F.2d at 565. Her
identification testimony was not derived in fact from the illegal police action. Nor [wa]s this a situation where an illegal search is conducted to discover the witness. The Supreme Court has "declined to adopt a 'per se’ or ‘but for' rule that would make inadmissible any evidence, whether tangible or live witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest.” The basis of [her] testimony [wa]s her personal observation, the testimony d[id] not derive from the illegal arrest.
Id. (citations omitted) (quoting United States v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978)).

. Jenkins's observation of Marshall, as described in the BOLO, admittedly raises concerns over the reliability of her observation. But, McKinley did question Jenkins about her inaccurate description during cross-examination.

. Jenkins was across the two-foot counter from the perpetrator during the encounter and testified during the trial that she was about as far from the perpetrator as she was from the court reporter.